NICOLA T. HANNA
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
SHAWN J. NELSON (Cal. Bar No. 185149)
Assistant United States Attorney
Acting Deputy Chief, Organized Crime
 Drug Enforcement Task Force Section
BENJAMIN D. LICHTMAN (Cal. Bar No. 241135)
Assistant United States Attorney
Santa Ana Branch Office
     411 West Fourth Street
     Santa Ana, California 92701
     Telephone: 213-894-5339/714-338-3530
     Facsimile: 213-894-0142/714-338-3708
     E-mail: shawn.nelson@usdoj.gov
             Benjamin.lichtman@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. SACR 14-00167-JVS |
| Plaintiff, | GOVERNMENT'S TRIAL BRIEF |
| v. | [18 U.S.C. § 922(a)(1)(A): Engaging in the Business of Manufacturing and Dealing Firearms without a License] |
| JOSEPH ROH, | |
| Defendant. | Trial Date: February 20, 2018<br>Location:  Courtroom of the Honorable James V. Selna |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Shawn J. Nelson and Benjamin Lichtman, hereby files its Trial Brief.

\\\

\\\

1

The government reserves the right to file additional briefs and motions as necessary before and during trial.

Dated: February 13, 2018          Respectfully submitted,

NICOLA T. HANNA
United States Attorney

LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division


_____/s/_____
SHAWN J. NELSON
BENJAMIN LICHTMAN
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# TABLE OF CONTENTS

                                                                    Page

TABLE OF AUTHORITIES................................................iii

GOVERNMENT'S TRIAL BRIEF.............................................1

I.   STATUS OF THE CASE AND CASE SCHEDULING MATTERS.................1

II.  THE CHARGES AND APPLICABLE LAW................................2

     A.   The Statues.............................................2

     B.   Elements................................................4

III. STATEMENT OF FACTS...........................................4

     A.   ROHG Industries.........................................4

     B.   Defendant's Contacts with ATF Regarding the
          Legality of Selling and Machining AR-15-type Lower
          Receivers Prior to 2013.................................5

     C.   April 17, 2013 Undercover Visit to ROHG.................6

     D.   The ATF Sends Defendant a Letter Explaining That
          His Business Practices Require a Federal Firearm
          License.................................................7

     E.   December 11, 2013 Undercover Visit to ROHG..............7

     F.   December 18, 2013 Undercover Visit to ROHG..............8

     G.   Service of the Cease-And-Desist Letter on
          Defendant..............................................10

     H.   Defendant Briefly Stops Manufacturing..................11

     I.   Defendant Resumes Firearm Sales........................11

     J.   Execution of a Search Warrant and Defendant's
          Indictment.............................................12

IV.  EVIDENTIARY ISSUES..........................................13

     A.   Stipulations...........................................13

TABLE OF CONTENTS - continued

Page

B.   Authentication and Identification/Chain of
     Custody...........................................13

     1.   Photographs.................................14

     2.   Recorded Conversations......................15

     3.   Firearms and Other Physical Evidence........16

C.   Defendant's Own Statements:  Admission by a
     Party Opponent....................................17

D.   Co-Conspirator Statements.........................19

E.   Expert Testimony..................................22

F.   Reciprocal Discovery..............................24

TABLE OF AUTHORITIES

Page

Federal Cases

Bourjaily v. United States,
   483 U.S. 171 (1987) ......................................... 19

Bryan v. United States,
   524 U.S. 184 (1998) ......................................... 4

Crawford v. Washington,
   541 U.S. 36 (2004) ......................................... 19

Gallego v. United States,
   276 F.2d 914 (9th Cir. 1960) ............................... 17

Garlington v. O'Leary,
   879 F.2d 277 (9th Cir. 1989) ............................... 22

Lucero v. Stewart,
   892 F.2d 52 (9th Cir. 1989) ................................ 14

Reyes v. United States,
   383 F.2d 734 (9th Cir. 1967) ............................... 17

Sendejas v. United States,
   428 F.2d 1040 (9th Cir. 1970) .............................. 20

United States v. Allen,
   425 F.3d 1231 (9th Cir. 2005) .............................. 19

United States v. Arambula-Ruiz,
   987 F.2d 599 (9th Cir. 1993) ........................... 20, 21

United States v. Arias-Villanueva,
   998 F.2d 1491 (9th Cir. 1993) .............................. 21

United States v. Barnes,
   604 F.2d 121 (2d Cir. 1979) ................................ 22

United States v. Blackwell,
   694 F.2d 1325 (D.C. Cir. 1982) ............................. 14

United States v. Bridgeforth,
   441 F.3d 864 (9th Cir. 2006) ............................... 19

United States v. Burreson,
   643 F.2d 1344 (9th Cir. 1981) .............................. 18

TABLE OF AUTHORITIES

Page

United States v. Carlson,
  423 F.2d 431 (9th Cir. 1970) ............................... 16

United States v. Chu Kong Yin,
  935 F.2d 990 (9th Cir. 1991) ............................... 14

United States v. Collicott,
  92 F.3d 973 (9th Cir. 1996) ................................ 18

United States v. Crespo de Llano,
  838 F.2d 1006 (9th Cir. 1987) ........................... 19, 20

United States v. De Bright,
  730 F.2d 1255 (9th Cir. 1984) (en banc) ...................... 17

United States v. Echeverry,
  759 F.2d 1451 (9th Cir. 1985) ........................... 21, 22

United States v. Fernandez,
  839 F.2d 639 (9th Cir. 1988) ............................... 18

United States v. Fleishman,
  684 F.2d 1329 (9th Cir. 1982) ........................... 20, 24

United States v. Gann,
  732 F.2d 714 (9th Cir. 1984) ............................... 24

United States v. Gomez,
  725 F.3d 1121, (9th Cir. 2013) ............................. 24

United States v. Green,
  523 F.2d 229 (2d Cir. 1975) ............................ 23, 24

United States v. Harrington,
  923 F.2d 1371 (9th Cir. 1991) .............................. 17

United States v. Henderson,
  241 F.3d 638 (9th Cir. 2000) ........................... 14, 15

United States v. Johnson,
  735 F.2d 1200 (9th Cir. 1984) .............................. 24

United States v. Kaiser,
  660 F.2d 724 (9th Cir. 1981) ............................... 17

United States v. King,
  587 F.2d 956 (9th Cir. 1978) ............................... 15

TABLE OF AUTHORITIES

Page

United States v. Layton,
    720 F.2d 548 (9th Cir. 1983)  ............................  21

United States v. Lechuga,
    888 F.2d 1472 (5th Cir. 1989)  ...........................  22

United States v. Loya,
    87 F.2d 1483 (9th Cir. 1987)  ............................  20

United States v. Marin,
    669 F.2d 73 (2d Cir. 1982)  ..............................  18

United States v. McMillan,
    508 F.2d 101 (8th Cir. 1974)  ............................  16

United States v. Miller,
    664 F.2d 94 (5th Cir. 1981)  .............................  22

United States v. Nakai,
    413 F.3d 1019 (9th Cir. 2005)  ...........................  18

United States v. Natale,
    526 F.2d 1160 (2d Cir. 1975)  ............................  14

United States v. Nixon,
    418 U.S. 683 (1974)  .....................................  20

United States v. Ortega,
    203 F.3d 675 (9th Cir. 2000)  ............................  18

United States v. Plunk,
    153 F.3d 1011 (9th Cir.)  ................................  15

United States v. Rrapi,
    175 F.3d 742 (9th Cir. 1999)  ............................  16

United States v. Santiago,
    837 F.2d 1545 (11 Cir. 1988)  ............................  22

United States v. Sawyer,
    607 F.2d 1190 (7 Cir. 1977)  .............................  16

United States v. Schmit,
    881 F.2d 608 (9th Cir. 1989)  ............................  21

United States v. Skeet,
    665 F.2d 983 (9th Cir. 1982)  ............................  24

TABLE OF AUTHORITIES

Page

United States v. Spawr Optical Research, Inc.,
    685 F.2d 1076 (9th Cir. 1982) ............................... 20

United States v. Thomas,
    586 F.2d 123 (9th Cir. 1978) ............................... 15

United States v. Tille,
    729 F.2d 615 (9th Cir. 1984) ............................ 21, 22

United States v. Torres,
    908 F.2d 1417 (9th Cir. 1990) ............................... 15

United States v. Turner,
    528 F.2d 143 (9th Cir. 1975) ............................... 16

United States v. Vento,
    533 F.2d 838 (3d Cir. 1976) ............................... 16

United States v. Villarman-Oviedo,
    325 F.3d 1 (3d Cir. 2003) ................................ 23

United States v. Williams,
    989 F.2d 1061 (9th Cir. 1993) ........................ 20, 21

United States v. Yarbrough,
    852 F.2d 1522 (9th Cir. 1988) ........................ 21, 22

United States v. Young,
    248 F.3d 260 (4th Cir. 2001) ............................... 25

United States v. Zavala-Serra,
    853 F.2d 1512 (9th Cir. 1988) ........................ 20, 21

Van Ripper v. United States,
    13 F.2d 961 (2d Cir. 1926) ............................... 16

<u>TABLE OF AUTHORITIES</u>

Page

**Federal Statutes**

18 U.S.C. § 921(a) ............................................... 2

18 U.S.C. § 921(a)(11)(B) ........................................ 3

18 U.S.C. § 922 (a)(1)(A) .................................. 1, 2, 13

**Other**

Fed. R. Evid. 106 ............................................... 18

Fed. R. Evid. 702 ............................................... 23

Fed. R. Evid. 703 ............................................... 24

Fed. R. Evid. 704 ............................................... 24

Fed. R. Evid. 801 ........................................ 18, 19, 20

Fed. R. Evid. 901 ........................................... passim

Fed. R. Evid. 905 ............................................... 15

### GOVERNMENT'S TRIAL BRIEF

**I.   STATUS OF THE CASE AND CASE SCHEDULING MATTERS**

1.   The Indictment was filed on October 2, 2014, and charges defendant with a single violation, Engaging in the Business of Manufacturing and Dealing in Firearms without a License in violation of 18 U.S.C. § 922(a)(1)(A).

2.   Defendant is free on bond pending trial.

3.   Defendant has waived trial by jury and a bench trial is set for February 20, 2018, at 8:30 a.m.

4.   The estimated time for the government's case-in-chief is two days.

5.   There are two pending pre-trial motions: the government's motion in limine to exclude an agent's statement of a legal opinion (CR 102) and defendant's challenge to the Government's expert (CR 99).  The Court denied the latter motion as untimely but directed the government to file a substantive response no later than February 15, 2018. (CR 100.)

6.   The parties have entered into various stipulations, which were filed on February 9, 2018.  These stipulations included the fact that no one was licensed to manufacture firearms at defendant's business premises, the dates that defendant owned and operated his companies, how the CNC machine that was used to make firearms operated, and the authenticity of most of the government's exhibits.

7.   Based on these stipulations, the government expects to call approximately ten witnesses in its case-in-chief, including an expert witness.  Based on the court's direction at the last motion hearing, the government will file declarations in lieu of direct examinations for its witnesses, with the exception of the government's expert

witness.  The government intends to file these declarations on February 15, 2018.  The government also intends to provide the court and defense with a copy of its exhibits on February 15, 2018.

8.   The government's final witness list and exhibit list will be presented to the Courtroom Deputy on the first day of trial.

9.   The government intends to use audio/computer equipment to play recordings of undercover meetings and transactions with defendant and his co-conspirators.  The government will provide transcripts of the recordings for the court's aid.  The transcripts have been shared with the defense and the parties have stipulated to the authenticity of the recordings and the accuracy of the transcriptions.

## II.   THE CHARGES AND APPLICABLE LAW

Defendant is charged with Engaging in the Business of Manufacturing and Dealing in Firearms in violation of 18 U.S.C. § 922(a)(1)(A).

### A.   The Statutes

Title 18, United States Code, Section 922(a)(1)(A) prohibits Engaging in the Business of Manufacturing or Dealing in Firearms and provides as follows:

> It shall be unlawful for any person except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing, or dealing in firearms, or in the course of such business to ship, transport, or receive any firearm in interstate or foreign commerce[.]  (Internal subsection markers omitted).

Title 18, United States Code, Section 921(a) provides further definitions as follows:

> (10) The term "manufacturer" means any person engaged in the business of manufacturing firearms or ammunition for purposes of sale or distribution; and the term "licensed

2

manufacturer" means any such person licensed under the provisions of this chapter.

(11) The term "dealer" means (A) any person engaged in the business of selling firearms at wholesale or retail, (B) any person engaged in the business of repairing firearms or of making or fitting special barrels, stocks, or trigger mechanisms to firearms, or (C) any person who is a pawnbroker.  The term "licensed dealer" means any dealer who is licensed under the provisions of this chapter.

(21) The term "engaged in the business" means—

     (A) as applied to a manufacturer of firearms, a person who devotes time, attention, and labor to manufacturing firearms as a regular course of trade or business with the principal objective of livelihood and profit through the sale or distribution of the firearms manufactured;

     . . .

     (C) as applied a dealer in firearms, as defined in section 921(a)(11)(A), a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms;

     (D) as applied to a dealer in firearms, as defined in section 921(a)(11)(B), a person who devotes time, attention, and labor to engaging in such activity as a regular course of trade or business with the principal objective of livelihood and profit, but such term shall not include a person who makes occasional repairs of firearms, or who occasionally fits special barrels, stockers, or trigger mechanisms to firearms;

(22) The term "with the principal objective of livelihood and profit" means that the intent underlying the sale or disposition of firearms is predominantly one of obtaining livelihood and pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection: *Provided*, That proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism. []

### B.  Elements

In order to establish defendant's guilt on Count One, the government must prove: (1) the defendant was willfully engaged in the business of [dealing in] [importing] [manufacturing] firearms within the dates specified in the indictment; and (2) the defendant did not then have a license as a firearms [dealer] [importer] [manufacturer]. Ninth Circuit Model Criminal Jury Instruction, No. 8.53 (2010 ed.).

The Ninth Circuit instruction further provides in the comments that willfully, as used in this statute, requires proof that the defendant knew that his or her conduct was unlawful, but does not require proof that the defendant knew of the federal licensing requirement.  Bryan v. United States, 524 U.S. 184, 198-99 (1998).

## III. STATEMENT OF FACTS

The government expects that the evidence at trial will establish the following facts, and others, in support of its case against defendant.

### A.  ROHG Industries

Defendant was the owner and operator of "ROHG Industries" ("ROHG"), which maintained a factory and business premises on Beach Boulevard in La Habra.  ROHG Industries sold firearm parts and accessories, primarily for AR-15-type firearms.

The firearm parts sold by ROHG included "unfinished" lower receivers for AR-15-type firearms.  "Unfinished" lower receivers are castings of lower receivers that have been partially machined but have not been machined to create a fire control cavity, nor drilled or indexed to accommodate a trigger, hammer, or selector pin.  An "unfinished" receiver is not a "firearm" for purposes of Title 18 and may be manufactured and sold without a federal firearms license.

4

However, in addition to selling such "unfinished" lower receivers, ROHG also machined those unfinished lower receivers into finished lower receivers for customers, on-site in its factory in La Habra, with customers playing a token role in the manufacturing process.  A completed AR-15-type lower receiver is, by itself, a firearm.  As a firearm, a completed AR-15-type lower receiver cannot be manufactured or sold without a federal firearms license.

Finally, ROHG also assembled completed lower receivers into functional weapons by installing parts onto the completed lower receivers.

ROHG does not and did not have a license to engage in the business of manufacturing or dealing in firearms.

As discussed below, between April 2013 and January 2014, government agents visited ROHG Industries five times in an undercover capacity and gathered evidence that defendant was unlawfully manufacturing firearms.  Furthermore, as discussed below, the ATF twice placed defendant on notice that his business practices were unlawful.

**B.  Defendant's Contacts with ATF Regarding the Legality of Selling and Machining AR-15-type Lower Receivers Prior to 2013**

ATF Industry Operations Intelligence Specialist ("IOIS") James Palm will testify that he met defendant at a southern California gun show in 2012, met with defendant and others at ATF's Santa Ana office around August 2012 where they discussed obtaining a federal firearms license, and exchanged e-mails with defendant about selling unfinished lower receivers.

These communications will show that defendant was aware that he needed a license to manufacture completed AR-15-type lower receivers. In fact, defendant specifically asked how he could get a determination as to whether an unfinished lower receiver was, in fact, unfinished.  IOIS Palm directed defendant to send samples to what is now ATF's Firearms and Ammunition Technology Division ("FATD").[1]  Defendant did send his samples to FATD and FATD determined that defendant's sample unfinished lower receivers were not finished and thus were not firearms.

**C.    April 17, 2013 Undercover Visit to ROHG**

In March 2013, ATF received anonymous tips that ROHG was possibly engaged in the unlicensed manufacture and dealing of firearms.

On April 17, 2013, ATF Special Agent Jeff Davis visited ROHG's factory in an undercover capacity.  During this visit, SA Davis expressed interest in purchasing a completed AR-15-type firearm. Defendant said that in order to sell a finished lower receiver or a completed firearm, SA Davis would have to provide identification and sign a form.  SA Davis did not have undercover identification, and so did not purchase a weapon or finished lower receiver.

SA Davis asked about the machining process.  Defendant indicated that it was very simple, that all the purchaser had to do was press a button on the milling machine, and that defendant or someone else would guide SA Davis in pulling the handle on the drill to make sure the holes were drilled accurately.  Defendant did, however, refuse to

---

[1] At the time FATD was known as the Firearms Technology Branch or "FTB."  For simplicity, the government will refer to it consistently as "FATD."

finish a lower receiver for SA Davis, because SA Davis did not have California identification.  SA Davis left and did not return.

### D.   The ATF Sends Defendant a Letter Explaining That His Business Practices Require a Federal Firearm License

On October 4, 2013, the ATF received a letter from defendant that read as follows:

> We here at ROHG Industries have been doing build parties for quite some time on CNC machines.  The customer installs the part into our machine and pushes the start button.  We want to get a ruling on this from the atf [sic] is this legal?
>
> Joe Roh
> ROHG Industries
> 1251 B. Beach Bvld [sic]
> La Habra ca 90631

In response, Earl Griffith, the Chief of ATF's Firearms Technology Branch, mailed defendant a letter on November 15, 2013 (the "response letter").  That response letter cited multiple statutory and regulatory authorities and specifically informed defendant that, if his described practice of holding "build parties" involved the procedures and steps outlined in the response letter, then the conduct constituted the manufacture of firearms by ROHG, and ROHG would be required to obtain a federal firearms license in order to conduct such business operations.

### E.   December 11, 2013 Undercover Visit to ROHG

In late 2013, ATF Special Agent Joshua Jackson was called in to assist in a DEA investigation that had resulted in the purchase of unmarked and unserialized AR-15-type firearms.  Agent Jackson identified the supplier.  The supplier stated that he obtained the firearms from ROHG Industries and agreed to introduce Agent Jackson to ROHG Industries

7

On December 11, 2013, ATF Special Agent Joshua Jackson conducted an undercover operation at ROHG with the supplier.  Upon entering the factory, SA Jackson observed an AR-15-type firearm being assembled by two men (later identified as defendant and his employee Greg Yim) for an unidentified customer.  SA Jackson also observed parts and machinery used to manufacture AR-15-type firearms.

SA Jackson asked about purchasing a completed AR-15-type short-barrel rifle.  Defendant explained that the average price for a completed AR-15-type firearm would be approximately $1,000, but would not sell the firearm configured as a short-barrel rifle.  SA Jackson told defendant he would return another time to purchase a firearm.

**F.    December 18, 2013 Undercover Visit to ROHG**

On December 18, 2013, SA Jackson conducted another undercover operation at ROHG with the supplier.  During that visit, SA Jackson observed AR-15-type firearms being made.  SA Jackson again observed machinery and hundreds of parts utilized to manufacture AR-15-type firearms.

During this visit, SA Jackson agreed to purchase one AR-15-type firearm and gave $1,000 to defendant and defendant's wife, Mary Roh, as payment.  Defendant required that Agent Jackson provide identification and fill out a form.  Agent Jackson engaged in a ruse that he did not have identification, and defendant said that he could sell the AR-15-type firearm but that the supplier would have to sign a form on SA Jackson's behalf since the supplier had previously purchased firearms at the factory.

As SA Jackson waited for his firearm to be manufactured, he observed defendant's employee Greg Yim setting up unfinished lower

receivers in a CNC machine[2] for other customers and machining the receivers in a process where the customers played a token role by pushing a green button on the CNC machine.  After each customer pressed the button, the machine would mill out the unfinished lower receiver into a finished lower receiver.  Each customer walked away from the CNC machine after pressing the green button once.  Greg Yim remained at the CNC machine to monitor the machining process, which took about 15 minutes to complete.

After the lower receivers were machined, Greg Yim drilled the lower receivers in a two-step process using two different drill presses.  During this drilling process, the customers again played a token role by turning the wheels of the drill presses to create holes in the machined lower receiver.  Greg Yim guided the customers on how fast or slow to turn the wheel to ensure the holes were drilled properly.  Greg Yim remained holding the machined lower receivers in place while the customers turned the wheel to complete the holes.

After Greg Yim completed the drilling and machining process, defendant would take the finished lower receiver and assemble the remaining parts (upper receiver, barrel, stock, bolt, trigger, etc.) to complete the weapon if the customer had also paid for that service.

Defendant and Greg Yim completed the above process with the supplier on behalf of Agent Jackson.  Greg Yim prepared the lower receiver for machining and had the supplier push the green start button.  Greg Yim then oversaw the machining process.  Greg Yim then

---

[2] Computer Numerical Control ("CNC") machines are automated milling devices that make industrial components by using computers to precisely machine materials into desired forms.

prepared the lower receiver to be drilled and guided the supplier through the turning of the handle on the drill press.  SA Jackson asked about the legality of the customer pushing the button.  Greg Yim grinned and replied "It's like you made it."

After Greg Yim finished the machining and drilling process, he gave the finished lower receiver to defendant.  Defendant then assembled the remaining parts (including the upper receiver, barrel, grip, and lower parts kit) to the lower receiver, creating a complete, functional weapon.  Defendant then handed the completed firearm to SA Jackson to inspect and told him that if he had any problem with the firearm, he could bring it back.  Defendant also explained how businesses like his were being shut down.

Finally, before leaving, Agent Jackson purchased a pistol from defendant's personal collection.

### G.   Service of the Cease-And-Desist Letter on Defendant

On December 23, 2013, ATF Special Agent Ludger Parent and IOIS Palm provided further notice to defendant that his conduct was unlawful by personally serving a cease-and-desist letter on defendant at the ROHG warehouse (the "C&D letter").  The C&D letter gave clear warning to defendant that his activities constituted the unlicensed manufacture of firearms in violation of federal law, advised defendant that he should cease and desist, and warned that his continued activity could result in criminal prosecution.

During this visit defendant and James Palm also talked.  James Palm made it clear to defendant that he had to get a license and gave defendant a license application.

1    In the days following service of the C&D letter, defendant

2   e-mailed IOI Palm about "build parties" and "what is legal or illegal

3   on the machine usage at our facility."  IOI Palm directed defendant

4   to contact ATF Director of Industry Operations Earl Kleckley for

5   guidance  Defendant acknowledged this but never contacted DIO

6   Kleckley.

7    **H.   Defendant Briefly Stops Manufacturing**

8    On January 9, 2014, Agent Jackson returned to ROHG Industries in

9   an undercover capacity along with Special Agent Bailey.  Defendant

10  was not present, but his co-conspirators Greg Yim and Mary Roh were.

11  The agents stated that Agent Bailey wanted to purchase an AR-15-type

12  firearm.  Greg Yim and Mary Roh explained that they were not offering

13  any milling service, that the ATF had shut them down, they could sell

14  parts and accessories, that that their attorney was "drafting a

15  letter," that it would be two to three weeks, and that when they got

16  the "green light," they would call.  Greg Yim asked SA Bailey to

17  leave his telephone number so Greg Yim could call SA Bailey after

18  operations had started back up at the factory.

19   **I.   Defendant Resumes Firearm Sales**

20   On January 14, 2014, Greg Yim called SA Bailey and told him that

21  he could come back to the factory to purchase AR-15-type firearms.

22  On January 15, 2014, Agent Jackson returned in an undercover capacity

23  along with Special Agent Hercules Fandino.  The agents explained that

24  SA Fandino wanted to purchase AR-15-type firearms.  Defendant

25  explained that they had a new policy in which customers first had to

26  join defendant's "gun club" before they could machine a lower

27  receiver.  Defendant told the agents that since SA Jackson had

28  already purchased firearms at the factory, he was already a member of

11

1    defendant's "gun club" and could vouch for SA Fandino so that SA
2    Fandino too could become a member of the "gun club."  Defendant told
3    SA Fandino that he also would need to pay a membership fee of $25.00
4    and fill out a form to join the gun club.

5        Special Agent Fandino negotiated with defendant and with Mary
6    Roh and ultimately agreed to purchase two AR-15-type firearms for
7    $2,000, including a $65 fee for each firearm for the machining
8    process and a $50 fee or each firearm for defendant's assembly of a
9    completed weapon.  With Mary Roh's help, Agent Fandino chose the rest
10   of the parts, including a stock, upper receivers, and lower parts
11   kits, for his firearms.

12       Defendant directed an unidentified young male ("UM") to start
13   the machining process for SA Fandino's AR-15-type firearms.  Similar
14   to the process used on December 18, 2013, the UM prepared each
15   unfinished lower receiver in the CNC before having Agent Fandino
16   press the green start button.  The UM then oversaw each machining
17   process while Agent Fandino walked away.  Again, similar to the
18   process used on December 18, 2013, the UM prepared each lower
19   receiver in each drill press and guided Agent Fandino through the
20   turning of the handle.

21       Finally, again, similar to the process seen on December 18,
22   2013, defendant assembled all of the parts Agent Fandino had selected
23   onto the finished lower receivers to create finished, functional
24   weapons.

25       **J.    Execution of a Search Warrant and Defendant's Indictment**

26       On February 6, 2014, ATF agents executed a federal search
27   warrant at ROHG.  Agents found the factory in the same general state
28   as during the undercover operations.  All machinery and tools were

still present and thousands of firearms parts were found.  Agents found and seized items including 33 completed long guns; 27 handguns; 1,935 AR-15-type barrels; 564 AR-15-type upper receivers with attached barrels; 483 AR-15-type unfinished lower receivers; 80 AR-15-type finished lower receivers; three items related to the conversion of firearms to fully automatic; five machines used to manufacture completed lower receivers; 49 jigs and blocks used to hold lower receivers during manufacturing; 270 magazines; more than 3,000 firearms parts (grips, sights, slides, bolts, stocks, springs, etc.); and approximately 642 customer record forms, approximately 40 of which post-dated the C&D letter, the earliest of which was dated January 12, 2013.

On October 2, 2014, a grand jury indicted defendant for a violation of 18 U.S.C. § 922(a)(1)(A) (engaging in the business of manufacturing and dealing in firearms without a license).

## IV.  EVIDENTIARY ISSUES

### A.  Stipulations

On February 9, 2018, the parties filed a document containing a series of trial stipulations.  (CR 101.)  In addition to other agreements, the parties stipulated to the authenticity and admissibility of many of the government's trial exhibits in this case, including the recordings of the interior portions of the undercover visits to ROHG Industries by ATF agents.

### B.  Authentication and Identification/Chain of Custody

While the parties have stipulated to many of the exhibits, there are still some exhibits that will have to be authenticated.

Federal Rule of Evidence 901(a) provides that "[t]he requirement of authentication or identification as a condition precedent to

admissibility is satisfied by evidence sufficient to support a
finding that the matter in question is what its proponent claims."
As such, issues of authenticity and identification are treated under
Rule 901 as simply "a special aspect of relevancy."  Fed. R. Evid.
901(a) (Advisory Committee Notes).

Rule 901(a) only requires the government to make a <u>prima facie</u>
showing of authenticity or identification "so that a reasonable juror
could find in favor or authenticity or identification."  <u>United
States v. Chu Kong Yin</u>, 935 F.2d 990, 996 (9th Cir. 1991).

The authenticity of proposed exhibits may be proven by
circumstantial evidence.  <u>United States v. Natale</u>, 526 F.2d 1160,
1173 (2d Cir. 1975).  Moreover, the prosecution need only prove a
rational basis from which the jury may conclude that the exhibits
did, in fact, belong to the defendant or a co-conspirator.  <u>United
States v. Blackwell</u>, 694 F.2d 1325, 1330 (D.C. Cir. 1982).

### 1.   Photographs

The parties have stipulated to the admissibility of the
government's proffered photographic exhibits.

Photographs may be authenticated by a witness who "identif[ies]
the scene itself [in the photograph] and its coordinates in time and
place."  <u>Lucero v. Stewart</u>, 892 F.2d 52, 55 (9th Cir. 1989).  It is
not necessary to have the photographer establish the foundation for
the photograph.  Any person sufficiently familiar with the area in
the photograph can be the proponent of the photograph.  <u>Id.</u>; <u>see also</u>
<u>United States v. Henderson</u>, 241 F.3d 638 (9th Cir. 2000) ("A lay
witness may give an opinion regarding the identity of an individual
depicted in a photograph provided the witness has had sufficient

contact with the defendant to achieve a level of familiarity that renders the lay opinion helpful.").

###### 2.   Recorded Conversations

The parties have stipulated to the foundation for the recorded conversations to be introduced in this case.

Audio recordings are admissible upon a showing that "the recording is accurate, authentic and generally trustworthy." United States v. King, 587 F.2d 956, 961 (9th Cir. 1978).

Rule 901(b)(5) sets a low threshold for voice identifications offered to determine the admissibility of recorded conversations.  It permits, by way of example only, "[i]dentification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker." Under this rule, audio recordings may be authenticated by persons who are not parties to the recorded conversation, as long as the person can identify the voices on the recording.  Fed. R. Evid. 905(b)(5); United States v. Torres, 908 F.2d 1417, 1425 (9th Cir. 1990); United States v. Thomas, 586 F.2d 123, 133 (9th Cir. 1978).  A witness's opinion testimony in this regarding may be based upon his having heard the voice on another occasion under circumstances connecting it with the alleged speaker.  Fed. R. Evid. 901(b)(5); Torres, 908 F.2d at 1425 ("Testimony of voice recognition constitutes sufficient authentication.").  If the identifying witness is "'minimally familiar' with the voice he identifies, Rule 901(b) is satisfied." United States v. Plunk, 153 F.3d 1011, 1022-23 (9th Cir. 1998), amended, 161 F.3d 1195 (9th Cir. 1998).

15

The speaker's identity also can be established by circumstantial evidence.  Fed. R. Evid. 901(b)(5), (6).  Such evidence may include: (1) defendant's identification of himself during the conversation either by surname, first name, or nickname (United States v. Vento, 533 F.2d 838, 864 (3d Cir. 1976); United States v. Turner, 528 F.2d 143, 163 (9th Cir. 1975); (2) the speaker's revelation of information particularly known to the person he purports to be (United States v. Sawyer, 607 F.2d 1190, 1193 (7th Cir. 1977); (3) the giving of directions which prove to be correct, or returning a call and referring to what was said in a previous conversation (Sawyer, 607 F.2d at 1193); or (4) visual surveillance of the defendant after the conversation doing what he said he would do (United States v. McMillan, 508 F.2d 101, 105 (8th Cir. 1974); see also Van Ripper v. United States, 13 F.2d 961, 968 (2d Cir. 1926) ("[T]he substance of the communication may itself be enough to make prima facie proof [of identity]")).

Although the recordings in this case are generally clear in sound quality, recorded conversations can serve as competent evidence even when they are partly inaudible, provided that the unintelligible portions are not so substantial as to render the recording as a whole untrustworthy.  United States v. Rrapi, 175 F.3d 742 (9th Cir. 1999); United States v. Carlson, 423 F.2d 431, 440 (9th Cir. 1970).

### 3.   Firearms and Other Physical Evidence

The government intends to introduce the firearms that were created during the undercover visits as well as other firearms parts and accessories.

To be admitted into evidence, a physical exhibit must be in substantially the same condition as when the crime was committed. The

16

Court may admit the evidence if there is "a reasonable probability the article has not been changed in important respects." United States v. Harrington, 923 F.2d 1371, 1374 (9th Cir. 1991). This determination is to be made by the trial judge and will not be overturned except for clear abuse of discretion. Factors the Court may consider in making this determination include the nature of the item, the circumstances surrounding its preservation, and the likelihood of intermeddlers having tampered with it. See United States v. Kaiser, 660 F.2d 724, 733 (9th Cir. 1981); Gallego v. United States, 276 F.2d 914, 917 (9th Cir. 1960).

In establishing chain of custody as to an item of physical evidence, the government is not required to call all persons who may have come into contact with the piece of evidence. Reyes v. United States, 383 F.2d 734 (9th Cir. 1967); Gallego, 276 F.2d at 917. Moreover, a presumption of regularity exists in the handling of exhibits by public officials. Kaiser, 660 F.2d at 733; United States v. De Bright, 730 F.2d 1255, 1259 (9th Cir. 1984) (en banc); Harrington, 923 F.2d at 1374. Therefore, to the extent that alleged or actual gaps in the chain of custody exist, such gaps go to the weight of the evidence rather than to its admissibility. Gallego, 276 F.2d at 917.

**C.   Defendant's Own Statements: Admissions by a Party Opponent**

The government intends to admit statements defendant made in writings, emails, his in-person interactions with James Palm and during undercover visits to ROHG's warehouse.

A statement is not hearsay, but rather constitutes an admission by a party-opponent, if the statement is offered against a party and is the party's own statement in either an individual or

17

representative capacity.  Fed. R. Evid. 801(d)(2)(A); <u>United States</u>
<u>v. Burreson</u>, 643 F.2d 1344, 1349 (9th Cir. 1981).

When the government admits a portion of a defendant's prior statement under Rule 801(d)(2)(A), the defendant may not put in additional out-of-court statements by him; such statements are hearsay when offered by the defendant.  Fed. R. Evid. 801(d)(2); <u>United States v. Nakai</u>, 413 F.3d 1019, 1022 (9th Cir. 2005) (exculpatory out-of-court statements that a defendant makes to a witness constitute inadmissible hearsay); <u>United States v. Ortega</u>, 203 F.3d 675, 681-82 (9th Cir. 2000) (defendant prohibited from eliciting his own exculpatory statements during cross-examination of government agent, because to permit otherwise would be to put such statements "before the jury without subjecting [defendant] to cross-examination, precisely what the hearsay rule forbids"); <u>United States</u> <u>v. Fernandez</u>, 839 F.2d 639, 640 (9th Cir. 1988)(same).

The only potential limitation of this principle is the "rule of completeness" in Federal Rule of Evidence 106, which has been applied by some courts to require that all of a defendant's prior statements be admitted where it is necessary to place an admitted statement in context or to avoid misleading the trier of fact.  It is entirely proper, however, to admit segments of a statement without including everything, and adverse parties are not entitled to offer additional statements just because they are there and the proponent has not offered them.  <u>United States v. Collicott</u>, 92 F.3d 973, 983 (9th Cir. 1996); <u>United States v. Marin</u>, 669 F.2d 73, 84 (2d Cir. 1982). Furthermore, Rule 106 does not render admissible evidence which is otherwise inadmissible under the hearsay rules.  <u>See</u> <u>Collicott</u>, 92 F.3d at 983 (hearsay not admitted regardless of Rule 106).

1

### D.   Co-Conspirator Statements

2     The government intends to admit statements by defendant's co-
3 conspirators, including Greg Yim, Mary Roh, and the unidentified
4 male, that were made during undercover visits to ROHG's warehouse.

5     Declarations by one co-conspirator during the course of and in
6 furtherance of the conspiracy may be used against another conspirator
7 and are not hearsay.  See Fed. R. Evid. 801(d)(2)(E).  Further,
8 statements made in furtherance of a conspiracy were expressly held by
9 the Supreme Court in Crawford v. Washington, 541 U.S. 36, 56 (2004),
10 to be "not testimonial," and as such, their admission does not
11 violate the Confrontation Clause.  The Ninth Circuit has reiterated
12 that "co-conspirator statements are not testimonial and therefore
13 beyond the compass of Crawford's holding."  United States v. Allen,
14 425 F.3d 1231, 1235 (9th Cir. 2005) (citing Crawford, 543 U.S. 36);
15 See United States v. Bridgeforth, 441 F.3d 864, 869 (9th Cir. 2006)
16 ("[I]f a statement is admissible under Rule 801(d)(2)(E), the
17 defendant's right of confrontation is not violated.").

18     Thus, the admission of co-conspirator statements pursuant to
19 Fed. R. Evid. 801(d)(2)(E) requires only a foundation that: (1) the
20 declaration was made during the life of the conspiracy; (2) it was
21 made in furtherance of the conspiracy; and (3) there is, including
22 the co-conspirator's declaration itself, sufficient proof of the
23 existence of the conspiracy and the defendant's connection to it.
24 See Bourjaily v. United States, 483 U.S. 171, 173, 181 (1987).

25     The government must prove by a preponderance of the evidence
26 that a statement is a co-conspirator declaration in order for the
27 statement to be admissible under Rule 801(d)(2)(E).  Bourjaily, 483
28 U.S. at 176; United States v. Crespo de Llano, 838 F.2d 1006, 1017

1   (9th Cir. 1987).  Whether the government has met its burden is to be

2   determined by the trial judge, not the jury.  United States v.

3   Zavala-Serra, 853 F.2d 1512, 1514 (9th Cir. 1988).

4       The trial court has discretion to determine whether the

5   government may introduce co-conspirator declarations before

6   establishing the conspiracy and defendant's connection to it.  United

7   States v. Loya, 87 F.2d 1483, 1490 (9th Cir. 1987).  It also has the

8   discretion to vary the order of proof in admitting a co-conspirator's

9   statement.  Id.  The Court may allow the government to introduce co-

10  conspirator declarations before laying the required foundation under

11  the condition that the declarations will be stricken if the

12  government fails ultimately to establish by independent evidence that

13  the defendant was connected to the conspiracy.  Id.; United States v.

14  Spawr Optical Research, Inc., 685 F.2d 1076, 1083 (9th Cir. 1982);

15  Fleishman, 684 F.2d at 1338.

16      It is not necessary for the defendant to be present at the time

17  a co-conspirator statement was made for it to be introduced as

18  evidence against that defendant.  See Sendejas v. United States, 428

19  F.2d 1040, 1045 (9th Cir. 1970).  Similarly, declarations of an

20  unindicted co-conspirator made in furtherance of the conspiracy may

21  be used against a charged conspirator.  See United States v. Nixon,

22  418 U.S. 683, 701 (1974); United States v. Williams, 989 F.2d 1061,

23  1067 (9th Cir. 1993).

24      To be admissible under Federal Rule of Evidence 801(d)(2)(E) as

25  a statement made by a co-conspirator in furtherance of the

26  conspiracy, a statement must "further the common objectives of the

27  conspiracy," or "set in motion transactions that [are] an integral

28  part of the [conspiracy]."  United States v. Arambula-Ruiz, 987 F.2d

20

599, 607-08 (9th Cir. 1993); <u>United States v. Yarbrough</u>, 852 F.2d 1522, 1535 (9th Cir. 1988).  Such statements are admissible whether or not they actually result in any benefit to the conspiracy. <u>Williams</u>, 989 F.2d at 1068; <u>United States v. Schmit</u>, 881 F.2d 608, 612 (9th Cir. 1989).  Thus, co-conspirator declarations need not be made to a member of the conspiracy to be admissible under Rule 801(d)(2)(E); they are admissible even if made to government informants and undercover agents.  <u>Zavala-Serra</u>, 853 F.2d at 1516 (statements to informants and undercover agents); <u>United States v. Tille</u>, 729 F.2d 615, 620 (9th Cir. 1984) (statements to informants); <u>United States v. Echeverry</u>, 759 F.2d 1451, 1457 (9th Cir. 1985) (statements to undercover agent).

Courts have interpreted the "in furtherance of" requirement broadly, considering, among other things, the following co-conspirator declarations as being made "in furtherance of the conspiracy":

- Statements made to induce enlistment in the conspiracy (<u>United States v. Arias-Villanueva</u>, 998 F.2d 1491, 1502 (9th Cir. 1993));

- Statements made to keep one conspirator abreast of a co-conspirator's activity, to induce continued participation in a conspiracy, or to allay the fears of a co-conspirator (<u>Arias-Villanueva</u>, 998 F.2d at 1502);

- Statements made to prompt action in furtherance of the conspiracy by either of the participants to the conversation (<u>United States v. Layton</u>, 720 F.2d 548, 556 (9th Cir. 1983));

21

- Statements related to the concealment of the criminal enterprise (<u>Tille</u>, 729 F.2d at 620; <u>Garlington v. O'Leary</u>, 879 F.2d 277, 283 (9th Cir. 1989));

- Statements seeking to control damage to an ongoing conspiracy (<u>Garlington</u>, 879 F.2d at 283);

- Statements made to reassure members of the conspiracy's continued existence (<u>Yarbrough</u>, 852 F.2d at 1535);

- Statements by a person involved in the conspiracy to induce a buyer's purchase of contraband by assuring the buyer of the person's ability to consummate the transaction (<u>Echeverry</u>, 759 F.2d at 1457);

- Statements identifying another co-conspirator as source for the contraband to be sold to a purchaser (<u>United States v. Lechuga</u>, 888 F. 2d 1472, 1480 (5th Cir. 1989);

- "Puffing," boasts, and other conversation designed to obtain the confidence of another conspirator (or apparent conspirator who actually was an undercover agent) (<u>United States v. Santiago</u>, 837 F.2d 1545, 1549 (11th Cir. 1988); <u>Lechuga</u>, 888 F.2d at 1480; <u>United States v. Miller</u>, 664 F.2d 94, 98 (5th Cir. 1981)); and

- Statements that refer to another conspirator as the boss, the overseer, or "sir" (<u>United States v. Barnes</u>, 604 F.2d 121, 157 (2d Cir. 1979)).

## E.   **Expert Testimony**

As described in the government's expert witness designation (CR 97), the government intends to call an expert witness in this case. Defendant has objected to this witness and noticed his own counter-expert.  As required by the Court's order of February 9, 2018, the

government will be filing its required response more fully addressing this issue on February 15, 2018.

ATF Firearms Enforcement Officer Daniel Hoffman will serve as a firearms expert to, among other things: (1) identify an unfinished AR-15-type lower receiver, which is not a firearm; (2) identify a finished AR-15-type lower receiver, which is a firearm; (3) explain the process for finishing an unfinished AR-15-type lower receiver into a finished lower receiver that is a firearm; (4) identify the parts required to complete an AR-15-type rifle or pistol; (5) demonstrate the assembly of an AR-15-type rifle or pistol; (6) explain additional features and processes related to AR-15-type lower receivers; and (7) explain that the practices seen in the recorded transactions in this case are consistent with the milling of an unfinished AR-15-type lower receiver and with the assembly of a completed AR-15-type rifle or pistol.  The bases and reasons for his opinions will be Firearms Enforcement Officer Hoffman's training, experience, and familiarity with firearms, including his experience assembling, disassembling, and repairing firearms, and his familiarity with the evidence in this case.

Pursuant to Federal Rule of Evidence 702, if specialized knowledge will assist the trier of fact in understanding the evidence or determining a fact in issue, a qualified expert witness may provide opinion testimony on the issue in question.  See United States v. Villarman-Oviedo, 325 F.3d 1, 13 (3d Cir. 2003)(Special Agent of the Drug Enforcement Agency was qualified by experience and his "specialized knowledge" to testify regarding the meaning of certain drug code words); United States v. Green, 523 F.2d 229, 236-37 (2d Cir. 1975) (no abuse of discretion in allowing the expert

testimony of an ATF examiner on the subject of handwriting identification where the examiner had completed a study program in document examination, an apprenticeship in the field, and had been qualified as a full-fledged document examiner for fourteen months). Moreover, an expert's opinion may be based on hearsay or on facts not in evidence, where the facts or data relied on are of the type reasonably relied on by experts in the field. Fed. R. Evid. 703. An expert may provide opinion testimony even if it embraces an ultimate issue to be decided by the trier of fact. Fed. R. Evid. 704; United States v. Fleishman, 684 F.2d 1329, 1335 (9th Cir. 1982). The Sixth Amendment does not forbid the expert from relying on hearsay evidence as the basis for his opinion testimony, so long as he is "applying his training and expertise to the sources before him and reaching an independent judgment." United States v. Gomez, 725 F.3d 1121, 1129, (9th Cir. 2013).

The admission of expert testimony or lay witness opinion testimony is within the discretion of the trial judge and will not be disturbed unless "manifestly erroneous." United States v. Gann, 732 F.2d 714, 724-25 (9th Cir. 1984); United States v. Skeet, 665 F.2d 983, 985 (9th Cir. 1982).

Law enforcement officers may testify about the general practice of criminals to establish the defendant's modus operandi. Such evidence alerts the jury to the possibility that a combination of seemingly innocuous events may indicate criminal behavior. See United States v. Johnson, 735 F.2d 1200, 1202 (9th Cir. 1984).

### F.   Reciprocal Discovery

Government has repeatedly requested reciprocal discovery. Defense counsel has assured government counsel that he will be

providing reciprocal discovery, but has not yet done so.  Thus, to the extent defendant may attempt to introduce or use any documents at trial that he has not produced, the government reserves the right to object and to seek to have such documents precluded.  <u>See</u> <u>United States v. Young</u>, 248 F.3d 260, 269-70 (4th Cir. 2001) (upholding exclusion under Rule 16 of audiotape evidence defendant did not produce in pretrial discovery where defendant sought to introduce audiotape on cross-examination of government witness not for impeachment purposes, but as substantive "evidence in chief" that someone else committed the crime).  Moreover, for a defense witness covered by Rule 26.2, the defense must come to court with any covered witness' statements and deliver them to the government as required by the rule, or have that witness' testimony stricken.