NICOLA T. HANNA
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
SHAWN J. NELSON (Cal. Bar No. 185149)
Assistant United States Attorney
Acting Deputy Chief, Organized Crime
 Drug Enforcement Task Force Section
BENJAMIN D. LICHTMAN (Cal. Bar No. 241135)
Assistant United States Attorney
Santa Ana Branch Office
     411 West 4th Street
     Santa Ana, California 92701
     Telephone: 213-894-5339/714-338-3530
     Facsimile: 213-894-0142/714-338-3708
     E-mail: shawn.nelson@usdoj.gov
             benjamin.lichtman@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. SA CR 14-00167-JVS |
|---|---|
| Plaintiff, | GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTIONS (1) FOR A JUDGMENT OF ACQUITTAL PURSUANT TO FED. R. CRIM. P. 29; AND (2) TO DISMISS FOR UNCONSTITUTIONAL VAGUENESS [CR 124] |
| v. | |
| JOSEPH ROH, | |
| Defendant. | Hearing Date: None Set<br>Hearing Time: None Set<br>Location: Courtroom of the<br> Honorable James v. Selna |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Shawn J. Nelson and Benjamin Lichtman, hereby files its Opposition to Defendant's Motions (1) for a Judgment of Acquittal Pursuant to Federal Rule of Criminal Procedure 29; and (2) to Dismiss for Unconstitutional Vagueness.

1        This Opposition is based upon the attached memorandum of points

2  and authorities, the files and records in this case, and such further

3  evidence and argument as the Court may permit.

4  Dated: March 23, 2018              Respectfully submitted,

5                                     NICOLA T. HANNA
                                       United States Attorney
6
                                       LAWRENCE S. MIDDLETON
7                                      Assistant United States Attorney
                                       Chief, Criminal Division
8

9                                       /s/
                                       _____
10                                     SHAWN J. NELSON
                                       BENJAMIN LICHTMAN
11                                     Assistant United States Attorneys

12                                     Attorneys for Plaintiff
                                       UNITED STATES OF AMERICA

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES................................................iii

MEMORANDUM OF POINTS AND AUTHORITIES.................................1

I.    INTRODUCTION AND SUMMARY OF ARGUMENT...........................1

II.   STATEMENT OF FACTS.............................................3

III.  DEFENDANT'S MOTION TO DISMISS MUST BE DENIED BECAUSE ANY
      VAGUENESS IN THE STATUTE IS CURED BY THE HEIGHTENED *MENS
      REA* REQUIREMENT AND BY DEFENDANT'S UNDERSTANDING AND
      ACCEPTANCE OF WHAT THE STATUTE PROHIBITED.....................8

      A.    Introduction...........................................8

      B.    "Manufacturer," "Dealer," "Engaged in the Business,"
            and Other Related Concepts are Well Defined by Statute
            and Regulation.........................................9

      C.    The Statutes and Regulations Adequately Define That a
            Finished AR-15-Type Lower Receiver is, in Fact, a
            Firearm...............................................11

      D.    The Heightened Willful *Mens Rea* Requirement
            Ameliorates any Vagueness in the Statutes.............13

      E.    Defendant's Conduct and Statements Show that he did,
            in Fact, Know that his Conduct was Prohibited.........15

IV.   DEFENDANT'S RULE 29 MOTION SHOULD BE DENIED BECAUSE THE
      GOVERNMENT HAS PROVEN THE ELEMENTS OF THE CHARGED OFFENSE....19

      A.    Introduction..........................................19

      B.    The Standard for a Judgment of Acquittal..............19

      C.    The Elements of 18 U.S.C. § 922(a)(1)(A)..............19

      D.    Defendant did not have a License to Manufacture and
            Deal in Firearms, the Conduct Occurred within the
            Dates in the Indictment and in the Central District of
            California............................................21

      E.    The Products that Defendant Produced and Sold were
            Firearms in that they were Weapons that Will Expel a
            Projectile by the Action of an Explosive and the
            Frames or Receivers of any Such Weapons...............21

            1.    The Completed, Functional AR-15-type Rifles and
                  Pistols are Firearms............................22

**<u>TABLE OF CONTENTS (CONTINUED)</u>**

<u>DESCRIPTION</u>                                                          <u>PAGE</u>

      2.   The Lower Receiver of an AR-15-type Firearm is a Receiver and Firearm Under the Gun Control Act......23

      3.   The ATF's Interpretation of 478.11 is Reasonable....24

      4.   ATF's Interpretation is Entitled to Deference.......28

      5.   The ATF's Interpretation of Section 478.11 Did Not Create a New Substantive Rule...................30

      6.   The APA Cases Cited by Defendant are Inapposite.....34

      7.   Defendant Himself Knew That AR-15 Lower Receivers Constituted "Receivers"............................36

  F.   Defendant's Conduct Constituted "Manufacturing" and "Dealing"..........................................38

  G.   Defendant Was Engaged in the Business Because He Kept His Factory Open for Customers Four Days a Week for Machining and Completion of Weapons, Used His Machining Services to Sell More Parts at Gun Shows and Clearly Made a Profit from the Manufacture of Completed Weapons and Finished Lower Receivers..........40

  H.   Defendant's Correspondence with ATF, the Steps He Took to Evade the Licensing Requirement, and His Admissions to the Undercover Agents Show that Defendant Acted Willfully...............................................42

      1.   Defendant's Correspondence with ATF.................43

      2.   Defendant's Conduct Evinced Willfulness............43

      3.   Defendant's Attempt to Portray Himself as Law-Abiding is Unavailing..........................44

V.   CONCLUSION....................................................45

**TABLE OF AUTHORITIES**

DESCRIPTION                                                                PAGE

**Federal Cases**

Aleknagik Natives, Ltd. v. United States,
    635 F. Supp. 1477 (D. Alaska 1985) ........................... 33

Auer v. Robbins,
    519 U.S. 452 (1997) .......................................... 30

Babbitt v. Sweet Home Chapter of Cmties. for a Great Oregon,
    515 U.S. 687 (1995) .......................................... 28

Brooks v. Donovan,
    699 F.2d 1010 (9th Cir. 1983) ................................ 25

Broughman v. Carver,
    2009 WL 2511949 (W.D. Va. Aug. 14, 2009) .................... 39

Bryan v. United States,
    524 U.S. 184 (1998) ...................................... 14, 20

Cabais v. Egger,
    690 F.2d 234 (D.C. Cir. 1982) ................................ 32

City of Chicago v. Morales,
    527 U.S. 41 (1999) ........................................... 8

Davis v. Michigan Dept. of Treasury,
    489 U.S. 803 (1989) .......................................... 25

District of Columbia v. Heller,
    554 U.S. 570 (2008) .......................................... 15

Esteban v. Cent. Mo. State Coll.,
    415 F.2d 1077 (8th Cir. 1969) ................................ 11

Gonzales v. Carhart,
    550 U.S. 124 (2007) .......................................... 15

Grayned v. City of Rockford,
    408 U.S. 104 (1972) ..................................... 8, 10, 11

Hernandez v. United States,
    859 F.3d 817 (9th Cir. 2017) ................................. 14

Hill v. Colorado,
    530 U.S. 703 (2000) .......................................... 11

Holder v. Humanitarian Law Project,
    561 U.S. 1 (2010) ........................................ *passim*

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                              PAGE

Huddleston v. United States,
     415 U.S. 814 (1974) ............................................. 25

Jordan v. DeGeorge,
     341 U.S. 223 (1951) ......................................... 10, 12

Kolender v. Lawson,
     461 U.S. 352 (1983) ............................................. 8

McCormack v. Herzog,
     788 F.3d 1017 (9th Cir. 2015) .................................. 15

McFadden v. United States,
     135 S. Ct. 2298 (2015) ........................................ 13

Modern Muzzleloading, Inc. v. Magaw,
     18 F. Supp. 2d 29 (D. D.C. 1998) .............................. 29

Nat'l Rifle Ass'n v. Brady,
     914 F.2d 475 (4th Cir. 1990) ............................... 28-29

Parker v. Levy,
     417 U.S. 733 (1974) ........................................... 19

Paul Revere Ins. Grp. v. United States,
     500 F.3d 957 (9th Cir. 2007) .................................. 25

Sig Sauer, Inc. v. Jones,
     133 F. Supp. 3d 364 (D. N.H. 2015) ........................... 29

United States v. Anaya-Acosta,
     629 F.3d 1091 (9th Cir. 2011) ................................. 29

United States v. Atandi,
     376 F.3d 1186 (10th Cir. 2004) ................................ 30

United States v. Black,
     739 F.3d 931 (6th Cir. 2014) .................................. 30

United States v. Cain,
     583 F.3d 408 (6th Cir. 2009) .............................. 35, 36

United States v. Evans,
     712 F. Supp. 1435 (D. Mont. 1989) ............................ 33

United States v. Focia,
     869 F.3d 1269 (11th Cir. 2017) ................................ 41

United States v. Guo,
     634 F.3d 1119 (1st Cir. 2011) ................................. 14

iv

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                PAGE

United States v. Harris,
    705 F.3d 929 (9th Cir. 2013) ................................. 15

United States v. Hsu,
    364 F.3d 192 (4th Cir. 2004) ................................. 16

United States v. Jimenez,
    191 F. Supp. 3d 1038 (N.D. Cal. 2016) ....................... 27

United States v. Kilbride,
    584 F.3d 1240 (9th Cir. 2009) ............................... 15

United States v. King,
    735 F.3d 1098 (9th Cir. 2013) ............................... 20

United States v. Lawrence,
    680 F.2d 1126 (6th Cir. 1982) ............................... 26

United States v. Lee,
    183 F.3d 1029 1032-33 (9th Cir. 1999) ....................... 14

United States v. Li,
    2008 WL 789899 (S.D. Cal. March 20, 2008) ................... 14

United States v. Mead Corporation,
    533 U.S. 218 (2001) ......................................... 28

United States v. Merriweather,
    777 F.2d 503 (9th Cir. 1985) ................................ 19

United States v. Nadirashvili,
    655 F.3d 114. (2d Cir. 2011) ................................ 20

United States v. Nelson,
    221 F.3d 1206 (11th Cir. 2000) ..................... 26, 32, 33

United States v. One Harrington,
    278 F. Supp. 2d 888 (W.D. Mich. 2003) ................... 29-30

United States v. One TRW, Model M14, 7.62 Caliber Rifle,
    294 F. Supp. 2d 896 (E.D. Ky. 2003) ......................... 29

United States v. Petrillo,
    332 U.S. 1 (1947) ........................................... 10

United States v. Picciotto,
    875 F.2d 345 (D.C. Cir. 1989) ........................... 34, 35

United States v. Ragen,
    314 U.S. 513 (1942) ......................................... 12

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                    PAGE

United States v. Reynolds,
    710 F.3d 498 (3d Cir. 2013) ................................... 36

United States v. Valverde,
    628 F.3d 1159 (9th Cir. 2010) ................................ 36

United States v. White,
    451 F.2d 696 (5th Cir. 1971) ................................ 27

United States v. Wu,
    711 F.3d. 1 (1st Cir. 2013) ...................... 13, 14, 16

United States v. Wyatt,
    408 F.3d 1257 (9th Cir. 2005) ........................... 13-14

Vill. Of Hoffman Estates v. Flipside,
    455 U.S. 489 (1982) ...................................... 13, 15

**Federal Statutes**

5 U.S.C. § 552(a)(1) ...................................... 33

18 U.S.C. § 922(a)(1)(A) ................................ *passim*

18 U.S.C. § 921(a)(3) ................................... *passim*

18 U.S.C. § 921(a)(10) .................................... 9

18 U.S.C. § 921(a)(11) .................................. 9, 40

18 U.S.C. § 921(a)(21) .................................... 9

18 U.S.C. § 921(a)(22) ................................... 10

18 U.S.C. § 922(a)(6) .................................... 27

18 U.S.C. § 922(g)(5)(A) ................................. 29

18 U.S.C. § 923(i) ............................. 12, 23, 25, 32

18 U.S.C. § 924 ................................... 14, 32, 33

18 U.S.C. § 926 ....................................... 28, 31

26 U.S.C. § 5845(b) ...................................... 34

28 U.S.C. § 599A(b)(1) ................................... 28

**Federal Regulations**

27 C.F.R. § 478.11 ..................................... *passim*

28 C.F.R. § 0.130 ..................................... 28, 31

vi

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.   INTRODUCTION AND SUMMARY OF ARGUMENT**

The indictment charges defendant with "willfully engag[ing] in the business of manufacturing and dealing in firearms, to wit, hundreds of AR-15-type lower receivers, completed pistols, and completed rifles" without a license, in violation of 18 U.S.C. § 922(a)(1)(A).  Defendant pleaded not guilty and a bench trial was held February 20-23, 2018.  Defendant has filed timely motions for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 and to dismiss for unconstitutional vagueness.

The facts in this case were largely undisputed.  The undercover videos and other evidence in this case clearly show the defendant engaging in the unlicensed manufacture and dealing of AR-15-type firearms.[1]  These firearms included completed lower receivers, completed rifles, and completed pistols.  Defendant has spent the bulk of this litigation focusing on the milling of unfinished lower receivers into finished receivers by his employees for paying customers and claiming that the customer's token role of pushing a start button or pulling a handle as absolving him of his dominant role in the manufacturing process.  This argument is absurd on its face.

More significantly, defendant does not address the evidence that his business included the manufacture and dealing of completed rifles and pistols.  The undisputed facts, as demonstrated in the videos, Dr. Juste's testimony, and stipulations, showed that a customer could

---

[1] Because Defendant's business and this trial focused exclusively on AR-15-type firearms and for brevity, unless otherwise noted, all references to unfinished lower receivers, finished lower receivers, completed rifles, or completed pistols are to AR-15-types.

come into defendant's factory and pay about $1,000, and, in return, defendant and his employees would manufacture a rifle or pistol by milling a lower receiver, attaching an upper assembly, stock assembly, and lower parts kit.  The customer would then leave with a completed firearm that did not exist prior to the customer's payment. All of this was done while defendant did not have a federal firearms license.

There is ample evidence that defendant acted willfully, that is, that he knew his conduct was illegal.  That evidence includes defendant's own correspondence with the ATF regarding lower receivers, the statements of defendant and his wife in the undercover videos that they knew ATF was shutting down similar businesses and that they knew ATF would be coming for them, and ATF's warnings to defendant. Therefore, defendant cannot credibly claim that he was confused about which piece of the AR-15-type firearm constituted the "frame or receiver," or that he did not know that his milling of lower receivers and creation of completed rifles and pistols for profit was unlawful.

After years of focusing almost exclusively on the supposed vagueness the term "manufacturing" as applied to his business, defendant's Rule 29 motion pivots to challenge the ATF's reasonable interpretation of the statute and regulation that define what constitutes the frame or receiver of a firearm -- an interpretation that defendant repeatedly demonstrated that he understood and shared. Defendant's new attempt to escape responsibility would require this Court to adopt an interpretation of a regulation that would sweep aside more than 50 years of the ATF's regulation of AR-15s and other

semiautomatic firearms, and which would seriously undermine the ATF's ability to trace and regulate firearms nationwide.

Because defendant's vagueness challenge is obviated by and subsumed into the *mens rea* requirement of the statute, the government will address the vagueness challenge first, before turning to defendant's Rule 29 motion.

Because any vagueness in the statute is cured by the heightened, willful *mens rea* requirement and because there is ample evidence that defendant himself actually understood what the statute prohibited, defendant's as-applied vagueness challenge must be denied.  Because the government demonstrated at trial that defendant did not have a license to manufacture or deal firearms, that the products he was producing and selling were firearms, that his conduct constituted manufacturing and dealing, that he was engaged in the business, and that he acted willfully, defendant's Rule 29 Motion must be denied.

## II.  STATEMENT OF FACTS

Prior to January 2013, defendant had been deeply involved in the firearms business, importing firearm parts and accessories and selling firearm parts and accessories through various businesses in Las Vegas and Southern California.  These business activities focused on AR-15-type parts and accessories, including the sale of unfinished lower receivers.  In fact, defendant spoke and corresponded with ATF's local industry operations staff asking about the legality of selling unfinished lower receivers and even wrote to ATF's Firearms and Ammunition Technology Division ("FATD")[2] seeking a determination

---

[2] At the time defendant sought the determination, the Firearms and Ammunition Technology Division was known as the "Firearms Technology Branch."  For consistency, the government will refer to it as the Firearms and Ammunition Technology Division or FATD.

whether the unfinished lower receivers he was selling were, in fact, unfinished lower receivers or had crossed the manufacturing line to be an actual frame or receiver.  Defendant received and celebrated ATF's determination that his unfinished lower receivers were, in fact, unfinished and had not crossed the manufacturing line to be receivers, and therefore firearms.  This correspondence demonstrated defendant's understanding, acceptance, and even welcoming of ATF's determination and classification of receivers.

In January 2013, as demand for untraceable AR-15-type firearms spiked after the mass shooting in Newtown, Connecticut, defendant added a new dimension to his business.  Not only would he sell unfinished lower receivers and every other part necessary to complete a rifle or pistol, he would also machine the unfinished lower receiver into a finished receiver and, if the customer wanted, complete the production of a rifle or pistol -- a weapon that would expel a projectile by the action of an explosive.

Defendant engaged in this business from about February 2013 through December 2013.  During this time defendant served about 600 total customers for whom he completed at least one finished receiver.  For approximately 150 of these customers, he completed rifles and pistols, all while being open only four days a week.

During this time, ATF agents visited defendant's factory in an undercover capacity.  Defendant willingly and without hesitation agreed to machine finished receivers and create rifles and pistols for the agents.  The recordings make clear that defendant, his business, and employees, had obtained a CNC machine, had programmed that CNC machine to unfinished lower receivers into finished receivers, would place the unfinished receiver into a jig, would

4

properly place the unfinished receiver and jig into the CNC machine, would direct the customer as to when to push the start button on the CNC machine, would oversee the machining process, would blow-away excess shavings, would remove the receiver from the CNC machine, had acquired the necessary drill presses, had equipped the drill presses with the correct drill bits, would place and align the unfinished receiver and jig into each of the drill presses, would direct the customer when and how quickly to pull the handle on the drill presses, would again blow-away any excess shavings, and would remove the finished receiver from the drill press and jig upon completion of the machining process.  This was done for at least one receiver for each of defendant's customers, generally for a sixty-five dollar fee (although apparently, discounts were available if the customer was buying a completed rifle or pistol or was buying more than one).  For about 150 of defendant's customers, this went even further.  As the recordings show defendant's business also included defendant personally, for a fifty-dollar fee, manufacturing a completed rifle or pistol by installing the remaining parts onto the finished lower receiver.

The recordings also show that defendant would engage in conversations with his customers.  During the December 18, 2013 undercover visit, after finishing the manufacture of a pistol for the undercover agent, defendant boasted that he would stand behind the completed pistol, as long as he was in business.  He clarified that he said this because ATF was "shutting down" businesses like his.

Despite having this clear evidence of illegal manufacturing, ATF served a C&D letter on defendant on December 23, 2013 (the "C&D Letter"), to provide him with unmistakable notice that he was engaged

in the business of manufacturing firearms.  Defendant objected to the service, bringing up a similar case involving the manufacture and dealing of lower receivers.  Defendant ultimately relented and signed the C&D letter.

Defendant then briefly ceased manufacturing firearms.  When undercover ATF agents went to defendant's factory on January 9, 2014, to confirm that he had ceased manufacturing firearms, they were met by defendant's wife, Mary Roh, and defendant's employee, Greg Yim. Mary Roh explained that ATF had come to the factory and served them with a C&D letter.  She continued, that they had known that ATF was coming because they were about the last business of their type that had not been shut down.  Greg Yim took the contact information of one of the undercover agents and promised to call him when they reopened. A few days later, Greg Yim called the undercover agent and told him they were back in business.

On January 15, 2014, undercover agents returned to purchase additional rifles and pistols from defendant.  The business was set up the same way as before the service of the C&D letter, with one small tweak to the business practice.  Now, in addition to the customer having to push the button and pull the handle at the employee's direction, the customer would have to join defendant's "gun club" and pay a fee that defendant would supposedly be donating. Otherwise, it was still clear that defendant, his business, and employees, engaged in each of the steps previously described.  Again, this would have been done for at least one lower receiver for each of the approximately 35 customers defendant served after reopening.  As before the service of the C&D letter, for about eight of defendant's customers, this went further.  The recordings again show defendant's

business also included defendant personally manufacturing completed rifles and pistols by installing the remaining parts onto the finished receiver, thereby creating a firearm that did not exist prior to the transaction.

As before the service of the C&D letter, defendant would engage in conversations with his customers. Again, even after the service of the C&D letter and his reopening with his slightly tweaked business practice, defendant stated that he expected the ATF to return.

ATF agents obtained and executed a search warrant at defendant's factory on February 6, 2014. Agents seized thousands of AR-15-type firearm parts, including unfinished lower receivers and other parts and accessories that were consistent with the completed rifles and pistols purchased by the undercover agents and Dr. Juste.

Agents also recovered the approximately 600 pre-C&D letter customer records and the approximately 35 post-C&D letter customer records. Agents also recovered the C&D letter, the application packet that ATF Industry Specialist Palm had given defendant along with the C&D letter, defendant's determination letter, a determination letter for his employee, Greg Yim, and other determination letters from ATF to other persons. They also seized customer appointment calendars and records, showing that defendant also finished lower receivers and completed rifles and pistols for customers he sold to at gun shows, such as Dr. Juste. Appointment calendars of this type were posted at the time of the search warrant and defendant and his employees were in the process of machining lower receivers at that time.

**III. DEFENDANT'S MOTION TO DISMISS MUST BE DENIED BECAUSE ANY VAGUENESS IN THE STATUTE IS CURED BY THE HEIGHTENED *MENS REA* REQUIREMENT AND BY DEFENDANT'S UNDERSTANDING AND ACCEPTANCE OF WHAT THE STATUTE PROHIBITED**

**A.   Introduction**

A statute is unconstitutionally vague in violation of the Due Process Clause of the 5th Amendment if it does not define the prohibited conduct with sufficient clarity that ordinary persons can understand what is prohibited or if it does not prevent arbitrary or discriminatory enforcement.  <u>Kolender v. Lawson</u>, 461 U.S. 352, 357 (1983); <u>City of Chicago v. Morales</u>, 527 U.S. 41, 56 (1999); <u>Grayned v. City of Rockford</u>, 408 U.S. 104, 108 (1972).

Defendant's vagueness argument seems to focus on two alleged points of ambiguity.  First, he argues that the terms "manufacturer" and "dealer" are not adequately defined (Mot. at 37:3-12) or are not specifically tailored enough to the business practice defendant designed to try to evade the statute (Mot. at 37:23-24).[3]  Second, he argues that the definition of an AR-15-type frame or receiver is unconstitutionally vague as applied to him.  (Mot. at 35-36.)  Each of these arguments fails because the government must prove that defendant's violations were "willful" and because there is ample evidence that defendant knew that he was illegally manufacturing and dealing in firearms and that a finished AR-15-type lower receiver is a "frame or receiver" and a "firearm."

---

[3] Defendant grossly mischaracterizes his business as one where customers simply "buy parts and accessories and assemble their own AR-15 with assistance from Mr. Roh and his staff."  (Mot. at 37.)

**B. "Manufacturer," "Dealer," "Engaged in the Business," and Other Related Concepts are Well Defined by Statute and Regulation**

Defendant argues, as he has throughout this litigation, that 18 U.S.C. § 922(a)(1)(A) is unconstitutionally vague as applied to him because "the statute and its related statutes . . . do not provide definitional guidance as to what it means to be a 'manufacturer' or 'dealer', or to be 'engaged in the business of . . . manufacturing or dealing in firearms,' . . ." (Mot. at 37) (first ellipses added, second ellipses in original).  This is patently incorrect.  The statute does, in fact, give specific meaning to each of these terms.

Title 18, United States Code, Section 922(a)(1)(A) provides that it shall be unlawful for any person "except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing, or dealing in firearms[.]"

Title 18, United States Code, Section 921(a)(10) defines a manufacturer as "any person engaged in the business of manufacturing firearms or ammunition for purposes of sale or distribution[.]" Title 18, United States Code, Section 921(a)(11) defines a dealer as a person "engaged in the business of selling firearms at wholesale or retail," or any person "engaged in the business of repairing firearms or making or fitting special barrels, stocks, or trigger mechanisms to firearms," or any pawnbroker.

Title 18, United States Code, Section 921(a)(21) defines "engaged in the business" as follows: "as applied to a manufacturer of firearms, a person who devotes time, attention, and labor to manufacturing firearms as a regular course of trade or business with the principal objective of livelihood and profit through the sale or distribution of the firearms manufactured"; as to a dealer in

9

firearms who sells firearms, whether receivers or completed weapons, as "a person who devotes time, attention, and labor to dealing in firearms as regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms"; and as applied to person who assembles, repairs, or "gunsmiths" firearms, as "a person who devotes time, attention and labor to engaging in such activity as a regular course of trade or business with the principal objective of livelihood and profit[.]"

Title 18, United States Code, Section 921(a)(22) defines the term "with the principal objective of livelihood and profit" meaning that the intent underlying the sale or disposition of firearms is predominantly one of obtaining livelihood and pecuniary gain.

This is clearly sufficient definition of the relevant terms.  A statute is not unconstitutionally vague merely because it lacks "mathematical certainty."  Grayned v. City of Rockford, 408 U.S. 104, 110 (1972).  Because a skilled advocate can easily argue that statutory words or phrases are ambiguous or lack discernible meaning, or can postulate confusing interpretations, the Supreme Court has carefully limited the void for vagueness doctrine and warned courts that the Constitution "does not require impossible standards," (United States v. Petrillo, 332 U.S. 1, 7 (1947)), or expect "perfect clarity and precise guidance" (Holder v. Humanitarian Law Project, 561 U.S. 1,19 (2010)).  The Supreme Court has given further guidance limiting the vagueness doctrine.  First, courts are not to impose "impossible standards of specificity."  Jordan v. DeGeorge, 341 U.S. 223, 231 (1951).  Second, the Court has reasoned that because "we are condemned to the use of words, we can never expect mathematical

10

certainly from our language." <u>Hill v. Colorado</u>, 530 U.S. 703, 733 (2000) (<u>quoting</u> <u>Grayned</u>, 408 U.S. at 110).   Third, language "marked by 'flexibility and reasonable breadth, rather than meticulous specificity'" is not unconstitutionally vague so long as it is clear what the ordinance as a whole prohibits.   <u>Grayned</u>, 408 U.S., at 110 (quoting <u>Esteban v. Cent. Mo. State Coll.</u>, 415 F.2d 1077, 1088 (8th Cir. 1969)).

The term "manufacture" itself needs no further statutory or regulatory definition.   As a noun, it is commonly, clearly, and sensibly interpreted to mean "the process of making wares by hand or machine especially when carried on systematically with division of labor."   <u>Webster's New Collegiate Dictionary</u> (9th ed. 1983).   As a verb, it is commonly, clearly, and sensibly interpreted to mean "to make from raw materials by hand or machinery."   <u>Id.</u>   These terms precisely describe defendant's conduct.

Thus, defendant's argument that these terms are insufficiently defined must be rejected.

**C.   The Statutes and Regulations Adequately Define That a Finished AR-15-Type Lower Receiver is, in Fact, a Firearm.**

Title 18, United State Code, Section 921(a)(3) defines a firearm as "any weapon [] which will or is designed to or may readily be converted to expel a projectile by the action of an explosive"[4] or "the frame or receiver of any such weapon[.]"   Title 27, Code of Federal Regulations, Section 478.11 defines a frame or receiver as "That part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded

---

[4] There can be no dispute that this portion of the definition describes the completed rifles and pistols that defendant produced.

11

1   at its forward portion to receive the barrel."  Title 18, United

2   States Code, section 923(i) requires that all firearms be marked with

3   a serial number on the frame or receiver.

4       Pursuant to its statutory and regulatory authority, the ATF,

5   through the FATD has interpreted these provisions and determined

6   that, although the AR-15-type lower receiver only provides housing

7   for the hammer and firing mechanism, that it is that singular part of

8   a firearm, which must be marked and serialized pursuant to 18 U.S.C.

9   § 923(i).

10      The fact that ATF has long applied this classification to the

11  AR-15-type lower receiver cuts against a vagueness finding, as does

12  the fact that industry has consistently demonstrated its

13  understanding of this classification by serializing the lower

14  receivers of such firearms.  (2/22/18 RT 108, 141.)  The Supreme

15  Court places great weight on whether a statutory phrase or term has

16  caused prior problems.  For instance, in rejecting a vagueness

17  challenge to the phrase "crime involving moral turpitude," the Court

18  held it was "significant that the phrase has been part of the

19  immigration laws for more than sixty years," and had not given rise

20  to problems in interpretation. Jordan v. DeGeorge, 341 U.S. 223, 229

21  (1951). Likewise, the Court upheld a tax evasion statute against a

22  vagueness challenge because "there ha[d] not been any apparent

23  general confusion bespeaking inadequate statutory guidance" for many

24  years, and therefore "[a] finding of unconstitutional uncertainty ...

25  would be a negation of experience and common sense." United States

26  v. Ragen, 314 U.S. 513, 524 (1942).  Here, in light of the ATF's

27  longstanding treatment of the AR-15 lower receiver and analogous

28  receivers in other firearms, defendant's claim that the definition of

12

receiver is unconstitutionally vague would be a "negation of experience and common sense."

Moreover, to the extent that there is any residual vagueness, that vagueness is ameliorated by the willful *mens rea* in Section 922(a)(1)(A) and contradicted by defendant's demonstrated understanding.  Thus, defendant's argument that the definition of "frame or receiver" is unconstitutionally vague must fail.

**D.  The Heightened Willful *Mens Rea* Requirement Ameliorates any Vagueness in the Statutes.**

The Supreme Court has made clear that *mens rea* requirements alleviate vagueness.  Any concern that a statute "fails to provide people of ordinary intelligence" an understanding of what conduct it prohibits is ameliorated when the statute contains a scienter requirement.  See Vill. Of Hoffman Estates v. Flipside, 455 U.S. 489, 499 (1982) ("[T]he Court has recognized that a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed."); Holder v. Humanitarian Law Project, 561 U.S. 1, 21 (2010) ("[T]he knowledge requirement of the statute further reduces any potential for vagueness[.]").  A *scienter* requirement in a statute alleviates vagueness concerns, narrows the scope of its prohibition, and limits prosecutorial discretion.  McFadden v. United States, 135 S. Ct. 2298, 2307 (2015).  In fact, where a statute requires a willful *mens rea*, the void-for-vagueness doctrine is especially inapposite.  United States v. Wu, 711 F.3d. 1, 15 (1st Cir. 2013).

The *mens rea* requirement limits the discretion of law enforcement.  United States v. Wyatt, 408 F.3d 1257, 1261 (9th Cir.

13

2005).  And a "willfulness" *mens rea* protects an innocent person who may accidently violate a law.  United States v. Lee, 183 F.3d 1029 1032-33 (9th Cir. 1999).  Even a complex regulatory scheme that requires several statutes and regulations to be read together can be ameliorated by a willful *mens rea*.  United States v. Guo, 634 F.3d 1119, 1123 (1st Cir. 2011).

The willful *mens rea* requirement prevents innocent, accidental, or unknowing violations.  United Sates v. Li, No. 07-CR-2915-JM, 2008 WL 789899 (S.D. Cal. March 20, 2008).  Therefore, the relevant inquiry consists not of an abstract analysis of constitutional vagueness, but what defendant knew.  Id.  See Holder v. Humanitarian Law Project, 561 U.S. 1, 22-23 (2010) (holding that plaintiffs cannot prevail in a vagueness challenge by "pointing to hypothetical situations designed to test the limits" of certain statutory terms, when their own case presented no such problem).  Defendant's sophistication and expertise in an area of law certainly informs this inquiry.  United States v. Wu, 711 F.3d 1, 14 (1st Cir. 2013).

In this case, Title 18, United States Code, Section 924 provides that a violation of 18 U.S.C. § 922(a)(1)(A) must be "willful."  The Supreme Court has explained that willfulness, in the context of § 922(a)(1)(A), requires that the government show that defendant knew that his conduct was illegal, even if does not have to show that defendant was aware of the specific licensing requirement.  Bryan v. United States, 524 U.S. 184, 199 (1998); Hernandez v. United States, 859 F.3d 817 (9th Cir. 2017).  This is a high standard.  For example, the jury instruction addressed in Bryan stated "A person acts willfully if he acts intentionally and purposely and with the intent to do something the law forbids, that is with the bad purpose to

14

disobey or disregard the law.  Now the person need not be aware of the specific law or rule that his conduct may be violating.  But he must act with the intent to do something the law forbids." <u>Bryan</u> at 190.

Because the government must prove that defendant knew that his conduct was unlawful, that is, that it constituted engaging in the business of manufacturing and dealing in firearms and that the finished lower receivers, rifles, and pistols were, in fact, firearms, defendant's vagueness challenge must fail.[5]

**E.   Defendant's Conduct and Statements Show that he did, in Fact, Know that his Conduct was Prohibited.**

Vagueness challenges to statutes that do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand.  <u>Vill. of Hoffman Estates v. Flipside</u>, 455 U.S. 489, 495 n.7 (1982).  Courts should limit themselves to determining whether a statute is vague as applied to the challenger's particular situation.  <u>Gonzales v. Carhart</u>, 550 U.S. 124, 167-68 (2007).  As-applied challenges turn on whether the statute provided adequate notice to a particular defendant that his particular conduct was proscribed.  <u>United States v. Harris</u>, 705 F.3d 929, 932 (9th Cir. 2013).  The court must look beyond the statute to defendant's conduct and other circumstances to determine if this defendant, in fact, had

---

[5] Defendant's pleas for a heightened vagueness standard must be rejected.  The cases he cites, <u>Hoffman Estates</u> and <u>McCormack v. Herzog</u>, 788 F.3d 1017, 1031 (9th Cir. 2015), <u>United States v. Kilbride</u>, 584 F.3d 1240 (9th Cir. 2009) do not involve the same *mens rea* or other factors applicable here.  Similarly, defendant's argument that the Second Amendment requires heightened scrutiny fails.  Defendant cites <u>McDonald v. City of Chicago,</u> 561 U.S. 742, 778 (2010), which rests on <u>District of Columbia v. Heller</u>, 554 U.S. 570 (2008), which in turn specifically stated that this line of cases does not cast doubt on laws imposing conditions and qualifications on the commercial sale of firearms.  554 U.S. at 626.

15

1   adequate notice.  Id; United States v. Hsu, 364 F.3d 192, 196 (4th
2   Cir. 2004).  Evidence adduced at trial can demonstrate Defendant's
3   knowledge that his conduct was proscribed.  United States v. Wu, 711
4   F.3d 1, 15, (1st Cir. 2013).

5        Combining the willful *mens rea* requirement with defendant's
6   actual knowledge and actions, it is clear that § 922(a)(1)(A) is not
7   vague as applied to defendant.  Defendant knew that machining
8   unfinished lower receivers into finished lower receivers was
9   manufacturing firearms.  He knew that producing completed rifles and
10  pistols was manufacturing firearms.  Why else then, would he have
11  made the customer play a token role in the process?  If he did not
12  believe that machining lower receivers into firearms was
13  manufacturing firearms, why wouldn't he just machine them and sell
14  them without the artificial requirements he dreamed up to evade the
15  statute?  This conduct alone shows that he understood that his
16  conduct was manufacturing and that finished AR-15-type lower
17  receivers were firearms.

18       Nor is it reasonable for defendant to argue that he thought that
19  his scheme to evade the statute by having the customer play the token
20  role of pushing the button or pulling the handle could conceivably
21  show uncertainty or vagueness.  The evidence showed that defendant,
22  his business, and employees engaged in every other necessary step,
23  including obtaining a CNC machine, programming that CNC machine to
24  mill unfinished receivers into finished receivers, placing the
25  unfinished receiver into a jig, properly placing the unfinished
26  receiver and jig into the CNC machine, directing the customer as to
27  when to push the start button on the CNC machine, overseeing the
28  machining process, removing the jig and receiver from the CNC

16

machine, blowing-away excess shavings, acquiring the necessary drill presses, equipping the drill presses with the correct drill bits, placing and aligning the receiver and jig into each of the drill presses, directing the customer when and how quickly to pull the handle on the drill presses, again blowing-away excess shavings, and removing the finished receiver from the jig upon completion of the machining process; and, if the customer wished, going further and producing a completed rifle or pistol.

Defendant's late-adopted argument that the definition of frame or receiver is unconstitutionally vague appears disingenuous in light of his own correspondence with ATF. In 2012 he corresponded with ATF Industry Operations Specialist James Palm about the point at which an unfinished AR-15-type lower receiver becomes a receiver and a firearm. (Gov. Exh. 120-125.) Defendant's own questions presuppose and demonstrate his knowledge and acceptance that a finished AR-15-type lower receiver is a firearm. And defendant's knowledge is most clearly shown in his seeking a determination from the FATD that his proposed unfinished lower receivers were not yet receivers or firearms. If defendant did not believe or understand that a finished lower receiver was a receiver and firearm, there would be no reason whatsoever for him to seek the determination or to celebrate FATD's response. In any case, FATD's response certainly put him on notice that a finished AR-15-type lower receiver was, in fact, a receiver

and firearm.[6]  The C&D letter gave him notice.[7]  Finally, the words of defendant and his wife show that he knew his conduct was prohibited. He told Agent Davis on April 17, 2013, "When you push the button, it's a firearm."  On December 18, 2013, in explaining that he would warranty Agent Jackson's firearm for "as long as [he's] in business," he qualified that by saying "As long as the ATF doesn't shut me down" and "They're shutting everybody down."  On January 9, 2014, defendant's wife stated that ATF had shut them down and that they were "pretty much that last ones that are not shut.  We knew it was coming."  While assembling one of Agent Fandino's AR-15-type firearms on January 15, 2014, defendant stated that if ATF came back it would be to "give [defendant] something," that they'd be "serving [defendant] with anything."

In addition to demonstrating that the statute was not unconstitutionally vague as applied to defendant, this evidence shows that defendant knew more than anyone else that his conduct was illegal.  One to whose conduct a statute clearly applies may not

---

[6] Additional evidence that defendant was on notice that a completed AR-type lower receiver was a receiver and firearm is seen in the 2013 determination letter from ATF to defendant (Gov. Exh 134) and the other determination letters that defendant possessed (Gov. Exh's. 132, 421R).  Further, after receiving the C&D letter, defendant asked Specialist Palm about conforming his business practices to the law.  Specialist Palm told defendant to contact Director of Industry Operations Earl Kleckley.  Defendant acknowledged receiving this direction, but failed to follow it.

[7] Notwithstanding defendant's inaccurate statement that he received no guidance regarding the legality of his business practices prior to February 6, 2014 (Mot. at 38:2-8), the C&D letter served on December 23, 2013, obviates all of defendant's arguments regarding Ruling 2015-1.  Ruling 2015-1 put the industry and community as a whole on notice.  A prosecution such as this one would now be viable without the service of a cease-and-desist letter, which put its recipient on personal notice that these business practices constituted manufacturing.

successfully challenge it for vagueness.  <u>Parker v. Levy</u>, 417 U.S. 733 (1974).

**IV.  DEFENDANT'S RULE 29 MOTION SHOULD BE DENIED BECAUSE THE GOVERNMENT HAS PROVEN THE ELEMENTS OF THE CHARGED OFFENSE.**

**A.  Introduction**

The Court can grant defendant's Rule 29 motion only if there was insufficient evidence to sustain a conviction for engaging in the business of manufacturing and dealing in firearms without a license. Defendant's motion must be denied because the government has proven that defendant did not have a license to manufacture or deal in firearms, that the products that defendant produced and sold were firearms, that his conduct constituted manufacturing and dealing, that he was engaged in the business, and that he acted willfully.

**B.  The Standard for a Judgment of Acquittal**

The test for a motion for Judgment of acquittal under Rule 29 is the same in the district court and on appeal: the Court "must determine whether, viewing the evidence in the light most favorable to the government, the jury could reasonably find the defendant guilty beyond a reasonable doubt."  <u>United States v. Merriweather</u>, 777 F.2d 503 (9th Cir. 1985).

**C.  The Elements of 18 U.S.C. § 922(a)(1)(A)**

The model Ninth Circuit instruction provides that in order to sustain a conviction for a violation of 18 U.S.C. § 922(a)(1)(A) the government must prove (1) defendant was willfully engaged in the business of dealing in or manufacturing firearms within the dates specified in the indictment; and (2) defendant did not then have a license as a firearms dealer or manufacturer.  <u>Ninth Circuit Model Jury Instruction</u> 8.53 (2010 ed., updated Feb. 2014).

"Willfully," as used in this statute requires proof that the defendant knew that his or her conduct was unlawful, but does not require proof that the defendant knew of the federal licensing requirement.  Id., citing Bryan v. United States, 524 U.S. 184, 198-99 (1998).

As to dealing, the government must prove beyond a reasonable doubt that the defendant engaged in a greater degree of activity than the occasional sale of a hobbyist or collector, and that the defendant devoted time, attention, and labor to selling firearms as a trade or business with the intent of making profits through the repeated purchase and sale of firearms.  Id., citing United States v. King, 735 F.3d 1098, 1106 (9th Cir. 2013).  For a person to engage in the business of dealing in firearms, it is not necessary to prove an actual sale of firearms.  Id., citing United States v. King, 735 F.3d at 1107 n.7.

Because 18 U.S.C. § 921(a) defines engaging in the business of manufacturing firearms nearly identically to engaging in the business of dealing in firearms, the same principles should apply to manufacturing.  That is, the government must prove that defendant's manufacturing activity was more than that of a hobbyist, that he had a profit motive for his manufacture of firearms, and that the government would be able to convict even without an actual manufacture of a firearm so long as defendant held himself out as a manufacturer of firearms.  King, 735 F.3d at 1107 n.8 (citing United States v. Nadirashvili, 655 F.3d 114. 120 (2d Cir. 2011)).

The government has proven each of these elements.  In the following sections, the government will set forth this evidence, element by element, starting with the uncontested elements that

defendant lacked a license, that the conduct occurred within the dates of the indictment, and that the conduct occurred in the Central District of California, before establishing that the products defendant produced and sold were firearms, that defendant's conduct constituted manufacturing and dealing, that defendant was engaged in the business, and that defendant acted willfully.

**D.  Defendant did not have a License to Manufacture and Deal in Firearms, the Conduct Occurred within the Dates in the Indictment and in the Central District of California.**

Defendant did not have a license to manufacture or deal in firearms.  (Trial Stipulation 1, CR 101; Gov. Exh. 11 (Supp. Palm Decl.), ¶ 5.)

The conduct at issue in this case occurred between January 12, 2013, and February 6, 2014.  (Gov. Exhs. 401, 402, Gov. Exh. 9 (Juste Decl.);  Gov. Exhs. 211, 311, 321, 331, 341 (recordings of undercover operations).

Defendant's factory was located at 1251-B Beach Boulevard, in the City of La Habra, the County of Orange, and the Central District of California.  (Trial Stipulation 2, CR 101.)

**E.  The Products that Defendant Produced and Sold were Firearms in that they were Weapons that Will Expel a Projectile by the Action of an Explosive and the Frames or Receivers of any Such Weapons.**

Title 18, United States Code, Section 921(a)(3) defines "firearm" as "any weapon which will or is designed to or may readily be converted to expel a projectile by the action of an explosive" or "the frame or receiver of such weapon."

### 1.  The Completed, Functional AR-15-type Rifles and Pistols are Firearms.

Defendant repeatedly and inaccurately claims that this case is only about the milling of unfinished lower receivers into finished lower receivers.

For instance he claims "the manufacturing charge is based solely on the ATF's internal 'classification' of a machined AR-15 blank as a firearm" (Mot. at 4) and presumes to set forth "The Government's Prosecution Theory on Manufacturing" as being based solely on the machining of unfinished AR-15-type lower receivers into finished AR-15-type lower receivers (Mot. at 5-6).  That is incorrect.  The indictment clearly charged defendant with "willfully engag[ing] in the business of manufacturing and dealing in firearms, to wit, hundreds of AR-15-type lower receivers, completed pistols, and completed rifles."  Just because defendant has spent his efforts attacking whether a finished AR-15-type lower receiver is a section 921(a)(3) receiver and firearm and whether the milling process alone constituted manufacturing does not negate the allegation and evidence that defendant produced and sold completed functional AR-15-type rifles and pistols, weapons which will expel a projectile by means of an explosive.[8]  (See 2/20/18 RT 130, 132:14-19; CR 101, Trial

---

[8] As the Court noted on the last day of trial, the government is not relying exclusively on the theory that defendant manufactured firearms exclusively based on defendant's manufacture of completed receivers.  (2/23/18 RT 188.)  The indictment charges the manufacture and dealing of (1) completed lower receivers, (2) completed rifles, and (3) completed pistols.  Defendant's motion addresses only the first category and fails to address the government's additional theories of liability.  The government's theories with respect to completed pistols and completed rifles do not depend in any way on whether the lower receiver of an AR-15 constitutes a "receiver" under § 478.11.  Because defendant has willfully violated § 921(a)(1) through his conduct relating to completed pistols and completed

Stipulation re Exhibits, at 5 (stipulating that approximately 25% of customer transactions involved the assembly of a completed AR-15-type firearm as depicted in Government's Exhibits 321 and 341)).

2.   The Lower Receiver of an AR-15-type Firearm is a Receiver and Firearm Under the Gun Control Act

Title 27, Code of Federal Regulations defines the frame or receiver as "That part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel."  This case involves AR-15-type firearms and there is no dispute that the lower receiver of an AR-15-type firearm only provides housing for the hammer and firing mechanism.  The bolt or breechblock is housed in the upper assembly.  This does not prevent the AR-15-type lower receiver from being a "receiver" and "firearm."

This was thoroughly explained by government witnesses during their direct examination.  The 478.11 definition requires that the frame or receiver be a single part, i.e., "That part of a firearm . . .."  In turn, Title 18, United States Code, Section 923(i) requires that one single part of a firearm to be serialized.  The preamble to § 478.11 further provides "When used in this part and in forms prescribed under this part, where not otherwise distinctly expressed or manifestly incompatible with the intent thereof, terms shall have the meanings ascribed in this section."

Defendant's argument is artificial, in that it would stop after the text of the definition of frame or receiver in § 478.11, while ignoring § 923(i) and the preamble to § 478.11 itself.

_____

rifles, this Court should convict defendant even if the Court disagrees with the government's theory of manufacturing lower receivers.

Defendant suggests that the lower receiver of an AR-15 cannot be a receiver because the ATF has ostensibly not complied with the APA's rulemaking procedures.  As discussed below, this argument is based on a flawed premise.  ATF's determination does not result from the promulgation of a new rule or regulation.  Rather, it is the result of ATF's interpretation of 27 C.F.R. § 478.11 in conjunction with 18 U.S.C. §§ 921(a)(3) and 923(i).  As discussed below, ATF's reading is logical as a matter of statutory interpretation, and it should also receive deference from this Court.  Furthermore, any concerns regarding fair notice are addressed by the willfulness requirement.

3.   <u>The ATF's Interpretation of 478.11 is Reasonable</u>

27 C.F.R. § 478.11 defines the term "firearm frame or receiver" as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel."  As the government's witnesses explained at trial, the lower receiver of an AR-15 is the portion of the firearm that constitutes a "receiver," which the manufacturer and the Department of Defense treated as the receiver, and which ATF has always regulated and required to be serialized as the receiver.  (2/22/18 RT 24, 71, 88, 137, 141, 142.) This has been the case since 1964.[9]

Defendant argues that an AR-15 lower receiver cannot meet the regulatory definition because it does not contain a bolt or breechblock.  This is incorrect.

---

[9] (2/22/18 RT 140-41.)  The ATF's classification of the AR-15-type lower receiver is consistent with and was accepted from the United States Military's classification of the M-16's lower receiver as the receiver.  (2/22/18 RT 24, 139-41.)

First, the preamble to § 478.11 makes clear that the definitions set forth in that regulation are not to be read in a manner that is incompatible with the intent of the overall regulatory scheme.  The regulation provides: "When used in this part and in forms prescribed under this part, where not otherwise distinctly expressed or manifestly incompatible with the intent thereof, terms shall have the meanings ascribed in this section."  27 C.F.R. § 478.11 (emphasis added).

This principle is also reflected in the canons of statutory interpretation.  Under the principle of *noscitur a sociis*, "statutory language cannot be construed in a vacuum," but rather "words of a statute must be read in their context and with a view to their place in the overall statutory scheme." Davis v. Michigan Dept. of Treasury, 489 U.S. 803, 809 (1989); see also Paul Revere Ins. Grp. v. United States, 500 F.3d 957, 962 (9th Cir. 2007).  Where a literal interpretation contravenes the purpose of the statutory scheme, leads to an absurd result, or is ambiguous, courts will look beyond the express language of the statute.  See Brooks v. Donovan, 699 F.2d 1010, 1011 (9th Cir. 1983).

Defendant's construction of the regulation would lead to absurd results and would severely frustrate enforcement of the GCA.  The purpose of the GCA is "to curb crime by keeping 'firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency.' " Huddleston v. United States, 415 U.S. 814, 824 (1974) (citations omitted).  That goal would be substantially frustrated if the ATF were unable to regulate AR-15 lower receivers.  See 18 U.S.C. § 923(i) (requiring importers and manufacturers to serialize "the receiver or frame" of firearms).  Yet

25

under defendant's reading, the lower receivers of AR-15-type firearms, and, in fact, nearly all semi-automatic firearms and many others, would not need to be serialized.  The necessary result of this would be that the unregulated parts could be manufactured, sold, and combined with other commercially available parts to create completed, unserialized firearms which would not be subject to background checks, and which would be untraceable.  (2/22/18 RT 74-76, 135-36, 142-44, 147-48.)[10]  In addition to thwarting ATF's ability to administer the firearms laws, it would be "manifestly incompatible" with the intent of the GCA to treat the lower receivers of AR-15-type firearms and huge numbers of other firearms as unregulated pieces of metal.  Defendant's reading of the regulation must therefore be rejected based on the language of § 478.11 itself, and the overall purpose of the GCA's statutory scheme.

Courts have repeatedly rejected constructions of the firearms laws that would defeat the applicable statutory schemes.  <u>See</u> <u>United States v. Nelson</u>, 221 F.3d 1206, 1209 (11th Cir. 2000) (upholding conviction under weapons statute and reasoning that under defendant's proposed interpretation "[i]f an ineligible buyer could simply use a 'straw man' or agent to obtain a firearm from a licensed dealer, the statutory scheme would be too easily defeated."); <u>United States v.</u>

---

[10] The government's witnesses testified that a "great many" other firearms would be affected because they do not contain all of the components listed in § 478.11, and that "most firearms" do not contain all of those components.  (2/22/18 RT 29, 74.) FATD Criminal Chief Max Kingery testified that this figure may be as high as 90% of all firearms, and that it would include all semiautomatic handguns and most bolt-action rifles.  (2/22/18 RT 74, 76.)  Defendant's interpretation would mean that nearly every semi-automatic firearm could be purchased piece by piece with no regulation or background check before a prohibited person would have a firearm.  This reading that would effectively render the Gun Control Act nugatory must be rejected.

Lawrence, 680 F.2d 1126, 1128 (6th Cir. 1982) (affirming conviction under § 922(a)(6) and stating that "[i]f sales such as this one were insulated from the law's registration provisions, the effect would be tantamount to a repeal of those provisions"); United States v. White, 451 F.2d 696, 699-700 (5th Cir. 1971) (affirming conviction under § 922(a)(6) and reasoning, "[w]ere the appellant's interpretation of the statute accepted, an individual could falsify the form and escape liability through an intermediary .... Surely, Congress could not have intended to allow such easy evasion of a comprehensive scheme.").

Because defendant's reading of the regulation would lead to absurd results and would frustrate the purpose of the GCA and ATF's ability to regulate firearms, the Court should decline to adopt that reading. Instead, the Court should find that the ATF's reading is reasonable, particularly in light of the heightened *mens rea* requirement and the fact that this defendant acted with actual knowledge.

Because a violation of Section 922(a)(1)(A), like most other provisions of the GCA, requires the government to prove willfulness, individuals cannot be prosecuted for unknowing or innocent possession of an AR-15-type lower receiver.  See United States v. Jimenez, 191 F. Supp. 3d 1038 (N.D. Cal. 2016).[11]

---

[11] Jimenez highlights this fact and that defendant should be convicted in this case.  ATF has the authority to interpret the GCA and its implementing regulations.  Even if a defendant or citizen disagrees with them.  But under the Bryan willfulness standard, a defendant cannot be convicted unless he was actually aware that an AR-15-type lower receiver has been classified by the ATF to be a "receiver."  As discussed below, defendant cannot make this claim.  In Jimenez, the Honorable James Donato, after hearing from the same Daniel O'Kelly who testified as a defense expert in this case, did

1              4.   <u>ATF's Interpretation is Entitled to Deference</u>

2         Congress and the Attorney General delegated authority to the ATF

3  to investigate, administer, and enforce the provisions of the Gun

4  Control Act ("GCA"), Chapter 44 of Title 18.  <u>See</u> 28 U.S.C.

5  § 599A(b)(1); 18 U.S.C. § 926(a); 28 C.F.R. § 0.130(a)(1).  That

6  delegation includes ATF's authority to investigate "criminal and

7  regulatory violations of the Federal firearms ... laws."  28 U.S.C.

8  § 599A(b)(1).  One of the Federal firearms laws that ATF is

9  authorized to enforce is 18 U.S.C. § 922(a)(1), the statute charged

10 in this case.

11        Courts recognize that when agency decisions are shown to be the

12 product of substantial expertise, they are entitled to deference.

13 <u>United States v. Mead Corporation</u>, 533 U.S. 218, 229 (2001)("The fair

14 measure of deference to an agency administering its own statute has

15 been understood to vary with circumstances, and courts have looked to

16 the degree of the agency's care, its consistency, formality, and

17 relative expertness, and to the persuasiveness of the agency's

18 position ...").  Regulatory agencies may interpret provisions in

19 their statutes, even though criminal sanctions may result.  <u>See</u>

20 <u>Babbitt v. Sweet Home Chapter of Cmties. for a Great Oregon</u>, 515 U.S.

21 687 (1995) (upholding EPA regulation interpreting parts of the

22 Endangered Species Act that provide for criminal penalties).

23        In administering the GCA, ATF enjoys the "deference generally

24 due an agency charged by Congress with implementing its directives."

25  

26 not invalidate the statute or rule that an AR-15-type lower receiver
could not be a "receiver," but rather ruled that the government
failed to prove that defendant Jimenez "had notice that his conduct

27 was criminal under the specific circumstances" of that case. 191 F.
Supp. 3d at 1044.  Judge Donato explicitly recognized that "other

28 cases might involve facts that show adequate notice to the defendant
or vitiate a vagueness challenge on other grounds."  <u>Id.</u>

1  Nat'l Rifle Ass'n v. Brady, 914 F.2d 475, 479 (4th Cir. 1990)

2  (finding that ATF may implement such regulations as are necessary to

3  carry out the purposes of the GCA, that ATF's determination is

4  entitled to deference, and that ATF's technical expertise makes it

5  "better equipped than the courts" to make determinations of statutory

6  enforcement).  See also United States v. Anaya-Acosta, 629 F.3d 1091,

7  1094 (9th Cir. 2011) (analyzing 18 U.S.C. § 922(g)(5)(A) and

8  concluding that "[b]ecause the statute itself is silent as to the

9  meaning of 'illegally or unlawfully in the United States,' we defer

10  to the ATF's interpretation.").

11      ATF firearm classifications are usually reviewed under an

12  "arbitrary and capricious" or similar standard.  United States v. One

13  TRW, Model M14, 7.62 Caliber Rifle, 294 F. Supp. 2d 896, 900 (E.D.

14  Ky. 2003), aff'd, 441 F.3d 416 (6th Cir. 2006)(ATF's classification

15  of M-14 as a "machinegun" not shown to be arbitrary);  Modern

16  Muzzleloading, Inc. v. Magaw, 18 F. Supp. 2d 29, 36 (D. D.C.

17  1998)(explicitly applying Chevron deference to review of ATF

18  classification of Knight Disc Rifle as a firearm); Sig Sauer, Inc. v.

19  Jones, 133 F. Supp. 3d 364, 371 (D. N.H. 2015), aff'd, 826 F.3d 598

20  (1st Cir. 2016) (upholding ATF's classification of a device as a

21  firearm silencer and reasoning that "[a]ll of these observations

22  require expertise that is well within the ATF's grasp. Thus, its

23  conclusions are entitled to substantial deference from a reviewing

24  court."); United States v. One Harrington, 278 F. Supp. 2d 888, 892

25  (W.D. Mich. 2003), aff'd, 100 F. App'x 482 (6th Cir. 2004) (the fact

26  that the M-14 has been classified [by ATF] as a machinegun since 1958

27

28

weighs against the possibility that the classification was arbitrary, capricious, or an abuse of discretion).[12]

In this case, ATF's Firearms and Ammunition Technology Division provides expert technical support on firearms and ammunition to the ATF, industry, the general public, and other federal, state, local, and foreign law enforcement agencies.  The FATD is the federal technical authority regarding firearms and ammunition and their classification under federal laws and regulations.  For decades, the FATD has classified the lower receiver of an AR-15 as the controlled, regulated portion of the weapon.  (2/22/18 RT 71.)  At trial, witnesses from the FATD, including the government's expert witness, explained ATF's reasoning in treating the AR-15 lower receiver as a receiver.  This Court should defer to that determination, which comports with the purpose of the GCA statutory scheme.

5.    The ATF's Interpretation of Section 478.11 Did Not Create a New Substantive Rule

Defendant argues that the Administrative Procedure Act ("APA") bars this prosecution because the ATF did not engage in the formal rulemaking process when it determined that AR-type lower receivers were "receivers" under the pertinent regulation.  Essentially, defendant argues that this prosecution must be dismissed because the ATF did not issue a ruling on the precise subject matter of this case.  But there is simply no requirement under the law for ATF, or

---

[12] See also United States v. Black, 739 F.3d 931, 935 (6th Cir. 2014) ("Because the CFR definition of a 'pistol' is a creature of the ATF's own regulations, the ATF's interpretation of it is controlling unless 'plainly erroneous or inconsistent with the regulation.') (citing Auer v. Robbins, 519 U.S. 452, 462 (1997) (internal citations and quotation marks omitted); United States v. Atandi, 376 F.3d 1186, 1189 (10th Cir. 2004) (recognizing that court owed "some deference" to ATF's regulation").

any other agency, to issue rulings to address every type of firearm or every set of facts that might satisfy a statute or regulation. Indeed, it would be unreasonable to expect agencies to engage in such endless rulemaking aimed at every conceivable firearm or every set of facts.

As discussed below, the ATF did not create any new law; it did nothing more than interpret the definition of "receiver" in light of § 478.11 and the regulatory and statutory scheme of which it forms a part.

Title 18, United States Code, Section 926 states "The Attorney General may prescribe only such rules and regulations as are necessary to carry out the provisions of this chapter."  The Attorney General has delegated that authority to the ATF. 28 C.F.R. § 0.130. The ATF has determined that individuals rules or regulations are not required to address the thousands and thousands of types of firearms whose lower receiver do not contain all of the parts listed in § 478.11  Defendant's argument to the contrary, that the Attorney General <u>must</u> promulgate a rule or regulation stating that the AR-15-type lower receiver is the "receiver" of the firearm, would lead to an absurd result.  Rather, the appropriate approach taken by the ATF, is that the agency interprets the regulation's applicability to each type of firearm.[13]

---

[13] Defendant's questioning of the ATF regarding a ruling it did issue regarding the reclassification of a receiver, Ruling 2008-1, only highlights the reasonableness of ATF's classification scheme. There, the ATF had previously classified the FNC rifle receiver as the "receiver" and there had been reliance on that classification. The ATF issued the ruling highlighting the changed classification. Thus, this exception proves the rule, ATF's classifications are stable and consistent; and reasonable.  (2/23/18 RT 105-06.)

ATF's reading of the definition harmonizes it with the language of the preamble of § 478.11, as well as 18 U.S.C. § 923(i).  Moreover, even if ATF's interpretation is found to be in tension with § 478.11, that does not mean that ATF has created a substantive rule subject to the APA.  See Cabais v. Egger, 690 F.2d 234, 238 (D.C. Cir. 1982) ("A statement which is interpretative does not become substantive simply because it arguably contradicts the statute it interprets.").

Courts facing similar challenges under the APA to firearms prosecutions have upheld convictions and rejected the argument that the ATF is required to engage in formal rulemaking prior to prosecuting firearms violations.  In United States v. Nelson, 221 F.3d 1206 (11th Cir. 2000), the defendant challenged his conviction under 18 U.S.C. § 924(a)(1)(A), based on his involvement in "straw purchases" of firearms.  Id. at 1208.  Defendant argued that the "straw purchase" theory of liability was a usurpation of legislative authority by the ATF, was unconstitutionally vague, and violated the APA.  Id.  On appeal, the Eleventh Circuit considered whether the identity of the actual buyer of a firearm is the type of information required by Chapter 44 of Title 18 to be kept in the records of a licensed firearms dealer.  Id. at 1209.  The court answered the question in the affirmative and upheld defendant's conviction on a "straw purchaser" theory, reasoning that a contrary reading of the statute would defeat the statutory scheme and permit defendants to escape liability.  Id. at 1209-1210.  In doing so, the court rejected precisely the same APA and vagueness arguments that defendant is raising in this case:

> Nelson asserts, however, that his conviction must be
> reversed because the ATF rather than Congress developed the
> "straw purchase" theory of liability and, in doing so, the

32

ATF usurped congressional power to define what conduct
constitutes a crime. Nelson also contends that his
prosecution under this theory was prohibited under the Due
Process Clause of the Fifth Amendment because the theory is
unconstitutionally vague. Finally, Nelson claims that the
ATF has failed to publish any regulations about the "straw
purchase" theory, in violation of the APA, 5 U.S.C. §
552(a)(1).

All of Nelson's arguments are without merit. First, the
basis for his conviction is § 924(a)(1)(A), which, as
already indicated, clearly contemplates liability for the
type of "straw purchases" at issue here. In other words,
Nelson's <u>offense was created and defined by Congress</u>, and
not by an impermissible delegation of legislative authority
to the ATF. Second, we conclude that Nelson's conviction
under the "straw purchase" theory does not violate due
process because this statute provides sufficient notice and
does not encourage arbitrary and discriminatory
enforcement. Finally, because Congress established this
"straw purchase" liability with sufficient definiteness,
<u>Nelson was clearly convicted of violating a statute. He was
not convicted of violating merely an unpublished agency
interpretation of that statute</u>. Therefore, Nelson's APA
claim is without merit.

<u>Nelson</u>, 221 F.3d at 1210 (emphasis added). <u>See also</u> <u>Aleknagik</u>

<u>Natives, Ltd. v. United States</u>, 635 F. Supp. 1477 (D. Alaska 1985),

<u>aff'd</u>, 806 F.2d 924 (9th Cir. 1986) (rejecting APA violation argument

where (1) analysis was interpretative and explained what the

Secretary of the Interior thought the statute meant; and (2)

plaintiffs had "actual and timely notice" of the interpretation).

At least one district court in the Ninth Circuit has already

rejected defendant's argument. In <u>United States v. Evans</u>, 712 F.

Supp. 1435 (D. Mont. 1989), <u>aff'd</u>, 928 F.2d 858 (9th Cir. 1991),

defendants were charged with multiple violations of the GCA and the

National Firearms Act. <u>Id.</u> at 1437. Defendants argued that the

prosecution violated their due process rights because the ATF had not

issued a formal interpretive ruling setting forth what items would

constitute "any combination of parts from which a machine gun can be

33

assembled" within the meaning of 26 U.S.C. § 5845(b).  Id. at 1443.
In rejecting defendants' argument, the court stated:

> The defendants suggest an agency is required to issue an
> interpretive rule where issuance of such a rule would
> clarify the meaning of an existing statute. The defendants
> offer no authority in support of their proposition that the
> failure of an agency, charged with enforcement of a
> particular criminal statute, to issue an interpretive
> ruling clarifying or explaining the meaning of that statute
> may constitute a violation of the right to due process of
> law of an individual charged under that statute. The court
> is unpersuaded that the failure of an administrative agency
> to issue an interpretive ruling constitutes a viable
> defense to a charge under a criminal statute validly
> enacted by Congress. The situation is simply not akin to
> the promulgation of a substantive rule of law by an
> administrative agency in accordance with the delegation of
> power by Congress. The Bureau of Alcohol, Tobacco and
> Firearms was not under any obligation to issue an
> interpretive ruling with respect to that agency's
> interpretation of the definition of "machine gun" set forth
> in 26 U.S.C. § 5845(b). Consequently, the court is
> compelled to reject the defendants' proposition to the
> effect that the failure of the Government, acting through
> the Bureau of Alcohol, Tobacco and Firearms, to issue an
> interpretive ruling regarding the meaning of 26 U.S.C. §
> 5845(b) constitutes a violation of the defendants' right to
> due process of law.

Id. at 1444.

### 6.   The APA Cases Cited by Defendant are Inapposite

In support of his argument that the ATF was required to engage
in formal rulemaking prior to this prosecution, defendant relies
heavily on United States v. Picciotto, 875 F.2d 345 (D.C. Cir. 1989),
in which the appellate court reversed a defendant's conviction based
on the United States Park Service's failure to comply with the APA.
However, Picciotto is readily distinguishable.  First, the defendant
in Picciotto was convicted of violating a "substantive rule"
promulgated by the Park Service, which created a new criminal offense
relating to the storage of personal property in a park, and that
offense  contained no *mens rea* requirement.  Id. at 345, 346, 348.

1   In other words, the Park Service in <u>Picciotto</u> was attempting to

2   "impose new substantive restrictions." <u>Id.</u> at 346.  The court

3   described the ensuing criminal case as "a criminal prosecution

4   founded on an agency rule ...." <u>Id.</u>  Here, in contrast, defendant

5   was charged with violating a statute validly enacted by Congress,

6   which contains a willfulness requirement.

7       Second, the analysis in <u>Picciotto</u> was based on the court's

8   conclusion that the rule was "null and void" because the agency had

9   promulgated the rule incorrectly.  <u>Id.</u> at 345-46.  Specifically, the

10  court found that the agency was abusing the APA rulemaking procedure

11  by attempting to pass a one-time, catch-all provision that would

12  exempt it from formal rulemaking going forward.  <u>Id.</u> at 346 ("In

13  essence, the Park Service is claiming that an agency can grant itself

14  a valid exemption to the APA for all future regulations, and be free

15  of APA's troublesome rulemaking procedures forever after, simply by

16  announcing its independence in a general rule.").  This case presents

17  a very different scenario.  This prosecution is not premised on any

18  rule, and there is no allegation that ATF promulgated any rule

19  incorrectly, much less attempted to establish a rule that would

20  formally exempt it from rulemaking requirements.  Instead, the

21  dispute centers on ATF's <u>interpretation</u> of a regulation.  And

22  notably, the <u>Picciotto</u> case expressly recognized that "[t]he agency

23  is entitled ordinarily to construe its own regulation." <u>Id.</u> at 347.

24  Thus, to the extent that it applies to the facts of this case at all,

25  <u>Picciotto</u> supports the ATF's ability to interpret § 478.11.

26      Defendant also relies on <u>United States v. Cain</u>, 583 F.3d 408,

27  410 (6th Cir. 2009), and similar cases involving the Sexual Offenders

28  Registration and Notification Act ("SORNA").  Those cases are also

inapposite, because they dealt with the Attorney General's promulgation of a regulation, the retroactive effect of that regulation, and the express claim that the regulation satisfied a "good cause" exemption from the APA rulemaking procedures which would otherwise apply.  See, e.g., Cain, 583 F.3d at 413.  The Cain court rejected the government's arguments regarding the good cause exemption, and found that the regulation at issue was not interpretive, but instead was a new "substantive rule that makes or creates law" and "imposes a new obligation."  Id. at 420 (internal quotations omitted), id. at 422.  Significantly, the court noted that "[t]he Attorney General does not claim ... to be merely explicating Congress's desires".  Id. at 420 (internal quotations and citations omitted).  Here, in contrast, ATF was explicating and interpreting Congress's desires by interpreting existing laws and regulations, namely, 18 U.S.C. §§ 921(a)(3), 923(i) and 27 C.F.R. § 478.11.  ATF did not attempt to exempt any rule from APA requirements under a "good cause" exemption.  The SORNA cases, which address the viability of that exemption, are therefore inapplicable.[14]

> 7.  Defendant Himself Knew That AR-15 Lower Receivers Constituted "Receivers"

Defendant's argument that AR-15 receivers are not "receivers" is disingenuous at best, because the evidence at trial established that defendant himself treated AR-15 lower receivers as receivers.

First, defendant has deep knowledge of the firearms industry. He has been involved in various business that imported and sold various firearm parts and accessories.

_____

[14] Defendant's reliance on United States v. Valverde, 628 F.3d 1159 (9th Cir. 2010) and United States v. Reynolds, 710 F.3d 498 (3d Cir. 2013) is misplaced for the same reasons.

In 2012, defendant corresponded with ATF Industry Operations Specialist James Palm about the point at which an unfinished AR-15-type lower receiver becomes a receiver and a firearm. Defendant's own questions presuppose that a finished AR-15-type lower receiver is a firearm and demonstrate his knowledge and acceptance of that fact. But defendant's knowledge is most clearly shown in his request for a determination from FATD that his proposed unfinished AR-15-type lower receivers were not "receivers" or firearms. If defendant did not believe or understand that a finished lower receiver was a "receiver" and firearm, there would be no reason whatsoever for him to seek the determination or celebrate FATD's determination that his proposed unfinished lower receivers were not yet "receivers" or firearms." FATD's response certainly put him on notice of that.[15] The Cease-and-desist letter gave him notice. Finally, the words of defendant and his wife and co-conspirator show that he knew his conduct was prohibited. He told Agent Davis on April 17, 2013, "When you push the button, it's a firearm." On December 18, 2013, in explaining that he would warranty Agent Jackson's firearm for "as long as [he's] in business," he qualifies that by saying "As long as the ATF doesn't shut me down" and "They're shutting everybody down." On January 9, 2014, defendant's wife and co-conspirator stated that ATF had shut them down and that they were "pretty much the last ones that are not

---

[15] Additional notice was provided by the 2013 determination letter from ATF to defendant (Gov. Exh 134), and the other determination letters that defendant possessed (Gov. Exh's. 132, 421R).

shut.  We knew it was coming."  While assembling one of Agent Fandino's AR-15-type firearms on January 15, 2014, defendant stated that if ATF came back it would be to "give [him] something," that they'd be "serving [him] with anything.

Additionally, defendant had Greg Yim's determination letter. This letter stated that the submitted samples had "reached a point in machining to be classified as a firearm in the GCA 18 U.S.C. 921(a)(3)."  He also had other determination letters.  (Gov. Exh's. 132, 134, 421R.)  He had printed out and highlighted the definition of a firearm in Section 921(a)(3).  (Gov. Exh. 409.)  Defendant's customer forms and a draft thereof, which he required to be filled out before machining, refer to "firearms." (Gov. Exh's 401R, 419.)

### F.   Defendant's Conduct Constituted "Manufacturing" and "Dealing"

Whether considering the completed rifles and pistols or just the finished lower receivers, defendant's conduct constituted "manufacturing."

It is undisputed that defendant's business "involved … the assembly of parts into a completed rifle."  (Mot. at 7.)  Defendant claims that this does not constitute manufacturing, but that theory is at odds with the plain meaning of the term "manufacture."  Indeed, it is difficult to conceive of another description of what defendant was doing.  A customer would walk in and pay about $1,000 and, in return, defendant's employees would take all of the steps described in Section II, *supra*, to finish the lower receiver, give that lower receiver to defendant, and defendant would install the upper receiver, the stock assembly, and lower parts kit to complete a

weapon that will expel a projectile by means of an explosive — a weapon that did not exist prior to the transaction.

Defendant was not adding components to fully manufactured weapons; he was literally creating firearms on demand by assembling different components, using a variety of tools.  That is manufacturing.  As one district court has stated:

> Under the GCA, a gunsmith who repairs a firearm is not a manufacturer because the gunsmith is only servicing a fully-manufactured "weapon ... designed to ... expel a projectile by the action of an explosive." § 921(a)(3)(B). The same is true for a gunsmith who purchases a fully-manufactured weapon, "fit[s] special barrels, stocks, or trigger mechanisms" to it, and then resells the firearm for commercial gain; it might be said that no manufacturing occurs in that situation because the gunsmith is only modifying a fully-manufactured weapon. But a gunsmith … who assembles component parts to create such a weapon is a manufacturer under the GCA, and accordingly must obtain a manufacturer's license.

Broughman v. Carver, 2009 WL 2511949, at *2 (W.D. Va. Aug. 14, 2009) (unpublished), aff'd, 624 F.3d 670 (4th Cir. 2010) (emphasis added).

Even considering the customers for whom defendant "merely" finished a lower receiver, there can be no reasonable dispute that defendant manufactured firearms where he had obtained a CNC machine, had programmed that CNC machine to mill unfinished lower receivers into finished lower receivers, would place the unfinished lower receiver into a jig, would properly place the unfinished lower receiver and jig into the CNC machine, would direct the customer as to when to push the start button on the CNC machine, would oversee the machining process, would remove the jig and lower receiver from the CNC machine, would blow-away excess shavings, had acquired the necessary drill presses, had equipped the drill presses with the correct drill bits, would place and align the unfinished lower receiver and jig into each of the drill presses, would direct the

customer when and how quickly to pull the handle on the drill presses, would again blow-away excess shavings, and would remove the unfinished lower receiver from the jig upon completion of the machining process.

Defendant's business used heavy machinery, tools, and their hands to produce finished lower receivers.  That is manufacturing, under the dictionary definition cited above in Section III.B.

Even if the process just described is not manufacturing, it still resulted in the creation of firearms, whether finished lower receivers or rifles and pistols.  Defendant, nevertheless, dealt those firearms by conducting a business in which he gave them to customers in exchange for money.[16]

> **G. Defendant Was Engaged in the Business Because He Kept His Factory Open for Customers Four Days a Week for Machining and Completion of Weapons, Used His Machining Services to Sell More Parts at Gun Shows, and Clearly Made a Profit from the Manufacture of Completed Weapons and Finished Lower Receivers**

Defendant engaged in the business of manufacturing and dealing in firearms, namely, completed AR-15 rifles, completed pistols (pistol-configured AR-15 firearms), as well as completed AR-15 lower receivers.  The evidence showed that customers repeatedly purchased completed AR-15 lower receivers, and that defendant also sold them fully completed firearms.  Dr. Franck Juste testified that he purchased a completed AR-15-type firearm from defendant, and that he

---

[16] Also, to the extent that defendant argues that he was not manufacturing completed weapons because he was merely installing parts onto the already completed lower receiver (as if the entire process were somehow segregable into discrete steps instead of the seamless process shown in the recordings) he is still "dealing" in firearms because the definition of "dealing" includes this sort of "gunsmithing."  18 U.S.C. § 921(a)(11)(B).

40

1  paid defendant extra money to assemble the completed firearms from

2  parts.  (2/21/18 RT 118-120, 124.)

3       Each time the undercover agents came into defendant's factory,

4  he would propose a price for a completed weapon or weapons, their

5  might be some haggling or negotiation, but a price of around $1,000

6  per firearm would be paid, and a firearm that did not exist before

7  would be created by defendant and his business.  There is no more

8  prototypical example of engaging in the business.

9       Defendant's production of completed weapons for customers was

10  not limited to Dr. Juste and the undercover agents.  The customer

11  appointment records in government's exhibits 415, 470B and 470D make

12  clear that some customers got finished lowers, only and some got

13  completed weapons.[17]  This was also confirmed by the stipulation that

14  approximately twenty-five percent of defendant's customers had him

15  complete a rifle or pistol.

16       Even without the finished receivers, defendant's sales of the

17  completed rifles and pistols demonstrated that he was engaged in the

18  business of manufacturing firearms.  The plain import of Section

19  922(a)(1)(A) and the subsections of Section 921 that define terms,

20  reflects congressional intent to criminalize the making or selling of

21  firearms as a business, whatever its relation to the maker or

22  seller's other conduct.  United States v. Focia, 869 F.3d 1269, 1281

23  (11th Cir. 2017).  Nothing in these statutes indicates that a person

24  violates Section 922(a)(1)(A) only by making or selling firearms as

25

26  _____

27       [17] There are some duplicate pages between these exhibits, but the
    entries include "prepaid [#] machine," "prepaid [#] machine only,"
    "paid $300 w/LPK [lower parts kit] will decide $50 install at shop,"
28  "prepaid (1) machine & (1) install," "prepaid machine and build," and
    "(1) full rifle [customer name and number]."

1   his primary means of income.  <u>Id</u>.  Rather the test focuses on

2   defendant's motivation for the making or selling, that is, was he

3   intending to profit from the making and selling.  <u>Id</u>. at 1182.

4   Defendant clearly profited from every element of his business,

5   including the money he made completing rifles and pistols.

6       This was a repetitive practice for defendant.  Defendant had

7   ample inventory on hand.  Mary Roh would ask whether customers wanted

8   only the machining of the receiver or a completed weapon.  Defendant

9   had all of the parts, tools, machines, and accessories needed for the

10  completion of weapons and the machining of lower receivers.  Prior to

11  the C&D letter, defendant machined at least one lower receiver for

12  each of the customers reflected in the approximately 600 customer

13  records.  (Gov. Exh. 401R.)  About 150 of these customers would have

14  purchased completed weapons.  (Trial Stipulation, CR 101 at 5.)

15  After the C&D letter, defendant served approximately 35 customers.

16  (Gov. Exh. 402R).  About eight of these customers would have

17  purchased completed weapons.  (Trial Stipulation, CR 101 at 5.)

18  Each time agents were in the factory, there were other customers.

19      Clearly it was defendant's time, attention, and labor (as well

20  as his tools, machines, and expertise) that was devoted to the

21  production of completed firearms and finished lower receivers as a

22  regular course of trade or business in order to make money.

23      **H.  Defendant's Correspondence with ATF, the Steps He Took to**
        **Evade the Licensing Requirement, and His Admissions to the**
24      **Undercover Agents Show that Defendant Acted Willfully**

25      The evidence at trial established beyond a reasonable doubt that

26  defendant's violations were willful, based on his correspondence with

27  ATF, his conduct, and his statements.

28

                                    42

### 1. Defendant's Correspondence with ATF

In 2012, defendant corresponded with ATF Industry Operations Specialist James Palm about unfinished lower receivers. This correspondence shows that he knows that machining a lower receiver results in the production of a firearm. This knowledge is confirmed by defendant sending for and receiving the determination letter from ATF which makes clear that machining an unfinished lower receiver into a finished lower produces a firearm.[18]

Moreover, defendant twice received written correspondence from ATF that put him on notice of the illegality of his business practices. On November 15, 2013, ATF sent defendant a letter explaining that his build-party activities would require a manufacturing license. (Gov. Exh. 134.)[19] On December 26, 2013, ATF agents personally served the C&D Letter on defendant, informing him that he was engaged in the unlawful manufacture of firearms, and that he needed a manufacturing license.

### 2. Defendant's Conduct Evinced Willfulness

Putting aside the express written notice that ATF provided, defendant's own conduct evinced his knowledge that his business practices were illegal. The very fact that defendant required customers to participate in the manufacturing process by pressing a button on a milling machine or turning a drill shows that defendant knew it was unlawful for his business to manufacture firearms for

---

[18] Additionally, defendant had the other determinations letters discussed in Section III.E.7. and footnote 6, above.

[19] Defendant vociferously challenged this exhibit and all three witnesses involved in its creation and later discovery. While the government cannot conclusively prove who sent the letter that triggered the ATF response, the evidence was clear that ATF sent the reply.

others.   The practice of having customers play a token role was a transparent attempt to circumvent that prohibition.

The fact that defendant briefly stopped manufacturing firearms after being served with the C&D letter shows that he knew that his manufacturing activities were illegal.   Similarly, during the January 15, 2014 undercover operation, defendant acknowledged that ATF had "shut down" his business, and that as a result, defendant was not selling firearms to anyone unless they became a member of defendant's "gun club."   Defendant's attempt to restrict his firearm sales after receiving the C&D letter shows that he knew his business practices were unlawful.   Similarly, during the December 18, 2013, undercover operation, defendant told the agent that "they" were shutting down businesses like his.   In sum, the statements of defendant and his wife, set forth in Sections II and III.E., above, about knowing that other businesses were being shut down and that ATF was coming for them, show that defendant knew his conduct was illegal.

3.   <u>Defendant's Attempt to Portray Himself as
Law-Abiding is Unavailing</u>

Defendant has argued that his refusal to break other laws shows that his conduct was not willful.   That argument is contradicted by the facts.   It was not that defendant did not want to break the law, it was that he did not want to get caught and have his successful business shut-down.

He did refuse to make short-barreled rifles.   But those are an obvious and easily identifiable violation.   Any customer with a short-barrel rifle is likely to be stopped, questioned, and arrested. And that would lead investigators right back to defendant's factory and a clear violation of the National Firearms Act.

Defendant's willingness to violate the law is most clearly demonstrated by his tutorial on how to defeat the California bullet-button requirement.  Defendant did insist on including a California-required bullet-button on the rifles.  Again, in California, this is an easily spot-able violation that would lead investigators back to his shop for a violation of state law.

Defendant's other violations of law also defeat this claim. First, he sold Agent Jackson the 1911-style pistol in violation of California law by not going through a federal firearms licensee. Defendant's hedging in the recording about how he was comfortable with the transaction demonstrates his knowledge of the transaction's illegality.  Second, defendant stated that he would have to charge tax if customers paid by credit card.  This suggests that defendant was not reporting his cash sales for tax purposes. Third, defendant possessed "lightning links," which are devices that can be installed in an AR-15-type lower receiver to make it fully automatic.  These devices themselves are classified as machineguns and were illegal for defendant to possess.

**V.    CONCLUSION**

Because the charged statute is not vague as applied to this defendant, and because the evidence at trial established the elements of the charged offense beyond a reasonable doubt, the government respectfully requests that this Court deny Defendant's Motions to Dismiss.